*In re* ANDREA D., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Andre D., Respondent-Appellant).

Second District    No. 2—02—0763

Opinion filed August 1, 2003.

Anna M. Wilhelmi, of Anna M. Wilhelmi Law Offices, P.C., of Aurora, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CALLUM delivered the opinion of the court:

Respondent, Andre D., appealed the trial court's orders finding him unfit and terminating his parental rights to his daughter, Andrea D. Respondent raised two arguments on appeal. First, he argued that the court's findings of unfitness were erroneous as a matter of law because the State's amended motion for termination of parental rights was not sufficiently specific, where it (1) did not state a cause of action; (2) did not comply with a statutory notice requirement to apprise respondent that he could "permanently" lose his parental rights (705 ILCS 405/2—13(4) (West 2000)); and (3) was not verified. Respondent next asserted that the trial court's determination that he was unfit was against the manifest weight of the evidence. We reversed. *In re Andrea D.*, 336 Ill. App. 3d 335 (2003). The State petitioned for leave to appeal to the supreme court. The State's petition was denied, but the supreme court, in an exercise of its supervisory authority, directed this court to vacate our judgment and to reconsider it, "including: (1) whether the State's amended petition for termination of parental rights was included in the State's petition for adjudication of abuse or neglect; and (2) if not, whether the State's amended petition for termination of parental rights is governed by section 2—13(4) of the Juvenile Court Act of 1987 (705 ILCS 405/2—13(4) (West 2002))." *In re Andrea D.*, 204 Ill. 2d 655 (2003). We vacate our prior judgment, and upon reconsideration of the issues, we affirm.

## I. FACTS

Andrea D. was born on July 6, 2001, to Carrie B. and respondent. Jerry Waite, an investigator at the Illinois Department of Children and Family Services (DCFS), testified that his office took a hotline report relating to both parents that suggested a risk of physical harm to Andrea D. On July 11, 2001, the State filed a petition for the adjudication of Andrea D. as a neglected and dependent minor and requested that the minor be made a ward of the court because her parents are bipolar and were not taking their medications and because Carrie B.'s substance abuse placed the child at risk of harm. See 705 ILCS 405/2—13 (West 2000).

A shelter care hearing was held on July 12, 2001. Respondent was not present. Waite testified that he spoke to the parents' landlord, who reported that the parents paid their rent and had not caused problems. The parents' apartment was appropriately furnished and free of alcohol and had adequate food. At the hospital, a nurse

informed Waite that the child did not have special needs and was eating on her own. Both Carrie B. and respondent are bipolar. Carrie B. indicated that she was not taking all of her medications, and respondent stated that he was not taking any medications. Mary D., respondent's sister, testified that respondent had rages and would threaten people.

A safety plan was implemented. It provided that Andrea D. would be placed with Mary D. Carrie B. signed the safety plan, agreeing that she would see the child only with supervision. Respondent signed the plan on July 11, 2001. Mary Beth Corrigan, a follow-up worker with DCFS, testified that she spoke to respondent, and he was agitated and angry and blamed Carrie B. for their problems. He also had difficulty focusing on one topic. The court found probable cause as to the State's allegations, and it placed the child in the temporary custody of DCFS and continued her placement with her aunt.

On August 1, 2001, respondent was arrested and charged with felony misconduct and possession of a weapon after he threatened to blow up the Aurora post office. In October 2001, he was sentenced to three years' imprisonment.

At the hearing on the petition for adjudication of neglect on October 2, 2001, respondent stipulated to two counts of neglect: Andrea D. was neglected in that she was under 18 and her environment was injurious to her welfare (see 705 ILCS 405/2—3(b) (West 2000)) in that (1) her parents were diagnosed as bipolar and were not taking their medications; and (2) her mother's substance abuse placed her at risk of harm.

The dispositional hearing took place on October 11, 2001. Respondent was present at the hearing. The trial court found that it was in Andrea D.'s best interest to be made a ward of the court. See 705 ILCS 405/2—22(1) (West 2000). As to respondent, the court found that, although he had indicated that he was willing to care for Andrea D., he was unable to do so due to his incarceration. The court also stated that respondent needed to complete the mental health portion of his client service plan and take parenting classes.

In a client service plan evaluation dated December 14, 2001, respondent was rated unsatisfactory in terms of his progress towards all of his goals, with the exception of taking his medications, for which he was rated satisfactory.

On February 4, 2002, the State filed a motion for termination of parental rights (see 705 ILCS 405/2—29 (West 2000)), alleging that respondent was an unfit person to have a child in that (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2000)); (2) he was

depraved (750 ILCS 50/1(D)(i) (West 2000)); (3) the child was in the temporary custody of DCFS, respondent was incarcerated and had little contact with the child prior to incarceration, and his incarceration would prevent him from discharging his parental responsibilities for a period in excess of two years after the filing of the motion for termination of parental rights (750 ILCS 50/1(D)(r) (West 2000)); and (4) the child was in the temporary custody of DCFS, respondent was incarcerated at the time the motion for termination was filed, respondent had been repeatedly incarcerated as a result of criminal convictions, and respondent's repeated incarceration had prevented him from discharging his parental responsibilities for the child (750 ILCS 50/1(D)(s) (West 2000)). The motion also contained allegations addressing Carrie B.'s unfitness. In its prayer for relief, the State requested that Andrea D. be continued as a neglected minor and ward of the court; that the parental rights of Carrie B. and respondent be terminated; that the Guardianship Administrator be continued as legal guardian and custodian of the minor and that she be given the power to consent to the minor's adoption; and that the consent of the guardian to the adoption of the minor be binding upon Carrie B. and respondent without any further notice to them or consent by them. On June 7, 2002, the State filed an amended motion for termination of parental rights that added citations to the allegations relating to subsections (D)(r) and (D)(s) of section 1 of the Adoption Act (750 ILCS 50/1(D)(r), (D)(s) (West 2000)).

At the hearing on the State's motion on July 11, 2002, the court admitted respondent's correctional records and certified copies of respondent's convictions. Kerri MacKowiak, a Catholic Charities caseworker, testified that respondent told her that he had punched a man in the face because the man was a street person and, if anyone said something that he did not like, he was going to take it out on the street. Respondent blamed DCFS workers for his problems in paying his rent and for losing a job. When MacKowiak spoke to respondent on July 20, 2001, he did not want visitation with his daughter.

MacKowiak further testified that she conducted a social history of respondent in the Kane County jail. Respondent told her that he often filled out work applications with his cousin's name so that he would not lose his Social Security benefits. He also picked up extra jail time on two occasions for fighting a cell mate and being involved in gangs. MacKowiak set up a client service plan for respondent, but there were no services available for him in the Kane County jail. In January 2002, respondent was on the waiting list for parenting classes at Logan Correctional Facility (Logan). He was eventually able to participate in parenting and GED classes. He wrote to MacKowiak on a regular

basis and indicated that he was interested in his daughter's progress. During the first year of Andrea D.'s life, respondent was incarcerated for 11 months. MacKowiak received only one letter from respondent addressed to his daughter.

The trial court took judicial notice of several of respondent's convictions, including theft of a firearm, residential burglary, felony disorderly conduct, unlawful use of a weapon by a felon, criminal damage to property, disorderly conduct, and violation of an order of protection.

Respondent, age 32, testified that he was currently housed at Danville Correctional Center. He had argued with a postmaster, who was brutal and belligerent. When a security guard started to shove respondent out of the post office, respondent stated that someone ought to blow the place up. However, he did not say that he was going to do so. He was angry because someone changed his address. This incident occurred after Andrea D. was born. Respondent further testified that, until age 23, he was involved with gangs. He estimated that he had been incarcerated about 10 times as an adult and that his longest prison stay was 25 months. His expected release date was July 29, 2002.

Respondent further testified that, when he was 18 or 19 years old, he beat up sex öffenders in prison because that was the way it was done. He lied about hearing voices in order to stay out of the general prison population, which was loud. He wrote to MacKowiak that everyone was used to him being in prison and that they felt it was part of his life. While he was at Illinois River Correctional Facility, respondent had gotten "into it" with another inmate and the two had to be placed in separate facilities. He was sent to Logan, where he had no problems. Respondent was taking his medications in prison.

On cross-examination, respondent testified that he had daily contact with his daughter prior to his incarceration. He changed diapers and sometimes stayed with his daughter overnight. He sent letters to MacKowiak to inquire about his daughter and wrote to his sister once or twice a month to ask about Andrea D. Respondent's mother, Darlene D., and his sister, Linda D., also kept him apprised of his daughter's progress. Respondent earned a parenting certificate, participated in GED classes, and was on the waiting list for anger management classes. Respondent came to the realization that he could not control everything, and he had to learn to deal with his anger. Some of the crimes he committed could have been caused by his failure to take his medications, which he did not take because he was unable to pay for them. He began to realize that something was wrong with his life if he could not retain custody of his daughter.

Respondent moved for a directed finding. The trial court granted the motion with respect to the allegation that respondent's incarceration will prevent him from discharging his parental responsibilities for a period in excess of two years after the filing of the motion for termination of parental rights (750 ILCS 50/1(D)(r) (West 2000)). The court denied the motion with respect to the State's other allegations.

Darlene D. testified that respondent called about his daughter two or three times and wrote six or seven letters asking about her. Mary D. testified that respondent contacted her many times about Andrea D. during the seven months that Mary was caring for Andrea D. Before his incarceration, he visited his daughter almost daily and bought her formula, a teddy bear, and outfits. Linda D. stated that respondent called her several times to inquire about his daughter. He also wrote letters twice a month and asked for pictures.

Respondent testified that his plans after release were to go to the community counseling center, to get into therapy, and to take his medication. When he takes his medication, he is more in control of his actions, and therapy helps him stay focused.

The trial court found both Carrie B. and respondent unfit. As to the first count against respondent, the court found that he had not shown a reasonable degree of interest, concern, or responsibility by virtue of his incarceration and as a result of his actions after Andrea D. was placed in foster care. Respondent did not come to court when the child was placed in care, and he did not want visitation prior to his incarceration. Further, he committed a felony after his child was born. The court also found respondent depraved, noting that, for each of the last 14 years, excluding the year 2000, he was incarcerated or involved in criminal actions. He had ample opportunities for rehabilitation, on which he had not followed up. The court noted that further evidence of respondent's depravity was his pattern of lying, including receiving Social Security benefits and then maintaining employment under someone else's name. In addition, he feigned mental illness to receive preferential jail treatment. The court noted respondent's expressions of anger and violence, including a statement in a letter that "ain't nobody going to take my baby girl and live to talk about it." Addressing his ability to parent his child, the court found respondent unfit due to his incarceration.

At the "best interests" portion of the hearing (see 705 ILCS 405/2—29(2) (West 2000)), MacKowiak testified that Andrea D. was currently placed in a nonrelative foster home and had been there since May 31, 2002, or about six weeks. That home was a preadoptive home. MacKowiak observed Andrea D. with the foster parents on one occasion, and the parents were affectionate and had bonded with the child.

Andrea D. has had only one visit with her father since his incarceration, and he was appropriate and affectionate during the visit. To be confident that his mental health issues have been addressed, MacKowiak wanted to see respondent stabilized on his medications for at least six months. She stated that respondent's parental rights to Andrea D. should be terminated because of his extensive criminal history and mental health issues. Linda D. would also be considered for adoptive placement.

Donna P., the guardian *ad litem*, testified that she had visited Andrea D. once or twice a month since August 1, 2001, and had seen her once in her current placement. The child was doing very well and bonding with her foster parents. Termination was in Andrea's best interests because her mother had shown no interest in her and because respondent had an extensive criminal history and suffered from mental illness.

Respondent testified that he wished to be a part of Andrea D.'s life. Andrea D. would have an extended family if respondent's parental rights were not terminated.

The trial court found that it was in Andrea D.'s best interests that respondent's parental rights be terminated. Noting respondent's criminal history, the court found that respondent had not changed his behavior through the years and that, when he had the opportunity to provide a nurturing environment for his daughter, he failed to do so. The court further found that, based on respondent's history of violence, Andrea D. was at risk. Respondent had not demonstrated in the past 14 years any responsibility for his own life, and it was inconceivable that he could change his behavior. Accordingly, the court concluded that it was in Andrea D.'s best interests to terminate respondent's parental rights and to free the child for adoption. An order terminating respondent's parental rights and authorizing the Guardianship Administrator to consent to Andrea D.'s adoption was issued on July 12, 2002. Respondent timely appealed.

## II. ANALYSIS

### A. Motion Taken with the Case

■ In a motion that we ordered taken with this case, the State requests that we strike a paragraph of respondent's brief as improper due to its argumentative nature. We note that, following the State's motion, respondent filed a motion to, *inter alia*, amend his brief to delete the argumentative portion of the aforementioned paragraph. We allowed respondent's motion. Therefore, given our disposition of respondent's motion, the State's request is denied as moot.

## B. Failure to State a Cause of Action

Respondent argues first that the State's pleadings were insufficiently specific such that they failed to state a cause of action.

■ The sufficiency of pleadings is an issue of law, which we review *de novo*. *U.S. Fire Insurance Co. v. Zurich Insurance Co.*, 329 Ill. App. 3d 987, 1002 (2002). The essential test of the sufficiency of a petition is whether it reasonably informs the respondent of a valid claim against him or her. *In re Harpman*, 146 Ill. App. 3d 504, 512 (1986). The requirement of pleading with specificity does not require more than a setting forth of the specific statutory grounds of unfitness. *In re M.S.*, 210 Ill. App. 3d 1085, 1092 (1991).

■ In its amended petition, the State alleged that respondent was an unfit parent under subsections (b), (i), (r), and (s) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(i), (D)(r), (D)(s) (West 2000)). The State recited the statutory language, without more. In *M.S.*, this court held that a petition that merely tracked the statutory language "was sufficient to apprise the respondent of the claim against her." *M.S.*, 210 Ill. App. 3d at 1093. Given this precedent, we conclude that the pleadings here were sufficiently specific.

## C. Pleading Defect Relating to Permanent Termination of Parental Rights

■ Respondent next argues that the trial court's finding of unfitness was erroneous because the State's petition was defective on its face in that it failed to apprise respondent that his parental rights could be "permanently" terminated. See 705 ILCS 405/2—13(4) (West 2000).

Respondent did not raise this issue at trial. Generally, pleading defects must be raised at trial so that they may be remedied; otherwise, the defects are waived. *In re Dragoo*, 96 Ill. App. 3d 1104, 1107 (1981). However, under the plain error doctrine, we may address a waived issue if the evidence is closely balanced or the error affects substantial rights. 134 Ill. 2d R. 615(a). The termination of parental rights affects a fundamental liberty interest. *In re J.J.*, 201 Ill. 2d 236, 243 (2002). Here, we are not amenable to invoking waiver where the question is whether respondent was provided with a statutorily mandated notice. Thus, we choose to review this question. *In re R.A.B.*, 315 Ill. App. 3d 620, 623 (2000) (plain error rule invoked where issue involved fundamental right to a jury trial); *In re J.C.*, 163 Ill. App. 3d 877, 891 (1987) (plain error rule invoked where issue involved fundamental right to effective assistance of counsel).

The supreme court ordered that we first determine "whether the State's amended petition for termination of parental rights was

included in the State's petition for adjudication of abuse or neglect."
We answer that question in the negative.

The State initiated proceedings relating to Andrea D. when it filed its petition for adjudication of abuse or neglect on July 11, 2001. The State alleged that Andrea D. was a neglected minor, that Andrea D. was not then in the protective custody of DCFS, and that it was in the child's best interest that she be made a ward of the court. The State requested a temporary shelter care hearing and, in its prayer for relief, requested that the court adjudge Andrea D. to be neglected and dependent and that she be made a ward of the court. The petition clearly did not request that respondent's parental rights be terminated.

In its amended motion for termination of parental rights, the State requests that Andrea D.'s parents' parental rights be terminated. It notes that Andrea D. was adjudicated neglected and made a ward of the court on October 11, 2001. It then recites the alleged bases for finding Carrie B. and respondent unfit and further asserts that it is in Andrea D.'s best interests that Carrie B.'s and respondent's parental rights be terminated and that DCFS remain legal guardian and custodian with the power to consent to her adoption. In its prayer for relief, the State requests that Andrea D. be continued as a neglected minor and ward of the court; that Carrie B.'s and respondent's parental rights be terminated; that the Guardianship Administrator be continued as legal guardian and that she be given the power to consent to Andrea D.'s adoption; and that the guardian's consent be binding upon Carrie B. and respondent.

The amended motion does not indicate that it incorporates the petition for adjudication of neglect. Indeed, the motion was not filed until June 7, 2002. The dispositional hearing had been conducted and the trial court had ruled on the petition on October 12, 2001. Thus, the State sought termination of respondent's parental rights in proceedings separate from its attempt to seek an adjudication of neglect.

Given that we answered the first question in the negative, we must next determine "whether the State's amended petition for termination of parental rights is governed by section 2—13(4) of the Juvenile Court Act of 1987 (705 ILCS 405/2—13(4) (West 2002))."

■ Section 2—13 of the Juvenile Court Act of 1987 (Act) provides, in relevant part:

"(1) Any adult person, any agency or association by its representative may file, or the court on its own motion, consistent with the health, safety and best interests of the minor may direct the filing through the State's Attorney of a petition in respect of a minor under this Act. The petition and all subsequent court documents shall be entitled 'In the interest of ..., a minor'.

(2) *The petition shall be verified* but the statements may be made upon information and belief. It shall allege that the minor is abused, neglected, or dependent \*\*\*. \*\*\*

(3) *The petition must allege that it is in the best interests of the minor and of the public that he be adjudged a ward of the court* and may pray generally for relief available under the Act. The petition need not specify any proposed disposition following adjudication of wardship.

(4) If termination of parental rights and appointment of a guardian of the person with power to consent to adoption of the minor under Section 2—29 is sought, the petition shall so state. *If the petition includes this request, the prayer for relief shall clearly and obviously state that the parents could permanently lose their rights as a parent at this hearing.*

*In addition to the foregoing, the petitioner, by motion, may request the termination of parental rights and appointment of a guardian of the person with power to consent to adoption of the minor under Section 2—29 at any time after the entry of a dispositional order under Section 2—22."* (Emphasis added.) 705 ILCS 405/2—13(1), (2), (3), (4) (West 2000).

Subsections (1), (2), (3), and the first paragraph of subsection (4) address petitions that seek both that the minor be made a ward of the court and a termination of parental rights. The second sentence of subsection (4) requires that such a petition "clearly and obviously state that the parents could permanently lose their rights." 705 ILCS 405/2—13(4) (West 2000).

■ We read the "In addition to the foregoing" language in the third sentence of subsection (4) to mean that there is an additional mechanism by which a party may request termination of parental rights. Accordingly, the third sentence permits a petitioner "at any time after the entry of a dispositional order" to request the termination of parental rights. A dispositional hearing under section 2—22 is the hearing at which the court determines whether it is in the child's best interests to be made a ward of the court. See 705 ILCS 405/2—22 (West 2000). Such a hearing occurred here on October 11, 2001, upon the filing of a petition that sought only that Andrea D. be made a ward of the court. Thus, the first paragraph of section 2—13(4) does not apply to the State's amended motion to terminate parental rights.

■ Instead, the State's motion is governed by the third sentence of section 2—13(4), which addresses a motion filed "under Section 2—29."

Section 2—29 of the Act provides, in relevant part:

"(1) With leave of the court, a minor who is the subject of an abuse, neglect, or dependency petition under this Act may be the subject of a petition for adoption under the Adoption Act

\*\*\*

(2) If a petition or motion alleges and the court finds that it is in the best interests of the minor that parental rights be terminated and the petition or motion requests that a guardian of the person be appointed and authorized to consent to the adoption of the minor, the court, with the consent of the parents, if living, or after finding, based upon clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act, may terminate parental rights \*\*\*." 705 ILCS 405/2—29(1), (2) (West 2000).

Section 2—29 permits, with respect to a child who has been adjudicated a ward of the court, the filing of a petition or motion that seeks to place the child up for adoption and to terminate parental rights. Whereas section 2—13(4) of the Act primarily addresses petitions filed in expedited proceedings that seek both to make a child a ward of the court and to terminate parental rights, subsection (1) of section 2—29 of the Act contemplates that these proceedings may be bifurcated, as they were in this cause, as the provision refers to separate petitions. Accordingly, the State's amended motion to terminate parental rights is governed by section 2—29 of the Act and not by section 2—13.

█ Respondent's argument that the State's pleadings were defective in failing to "clearly and obviously" state that the respondent could "permanently" lose his parental rights fails. The notice requirement appears in the second sentence of section 2—13(4), which, as we discussed above, applies only to petitions that seek both to adjudicate a child a ward of the State and to terminate parental rights. As the State's amended motion here sought only the latter, the second sentence of section 2—13(4) does not apply to the State's pleadings.

## D. Verification of Pleadings

Respondent next argues that the State's pleadings were insufficient in that they were not verified. The State supplemented the record on appeal with a copy of its amended pleadings that contained a verification page. It contends that this should resolve the verification issue. Alternatively, the State contends that any error in failing to include the verification page should be deemed harmless because its initial petition seeking termination of parental rights was verified. We resolve this issue in the State's favor, but on an alternative basis.

As we discussed above, section 2—13 of the Act primarily addresses petitions that are filed in expedited proceedings. The verification requirement in subsection (2) relates to petitions that allege that a minor is abused, neglected, or dependent. Thus, the verification requirement applies to petitions that seek to adjudicate a minor a

ward of the court. See 705 ILCS 405/2—13(3) (West 2000). Upon review of the entire Act, we found no other provision requiring verification.

■ Generally, civil pleadings need not be verified. See 735 ILCS 5/2—605 (West 2000). However, where a pleading is verified, all subsequent pleadings must be verified, unless excused by the court. 735 ILCS 5/2—605(a) (West 2000). An amended pleading need not be verified where the initial pleading was verified. *People ex rel. Hartigan v. All American Aluminum & Construction Co.*, 171 Ill. App. 3d 27, 37 (1988). Here, the State's initial motion for termination of parental rights, filed on February 4, 2002, was verified. Therefore, the amended motion to terminate respondent's parental rights was not, as respondent suggests, defective.

### E. Unfitness Finding

■ Finally, respondent challenges the trial court's finding that he was unfit. Where a challenge is made to the sufficiency of the evidence underlying a trial court's determination of unfitness, a reviewing court will reverse such a finding only where it is against the manifest weight of the evidence. *In re Adoption of Syck*, 138 Ill. 2d 255, 276-78 (1990). A determination of unfitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result. *In re D.D.*, 196 Ill. 2d 405, 417 (2001).

■ Under the Act, the involuntary termination of parental rights is a two-step process. First, there must be showing, based on clear and convincing evidence, that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2000)). If the court makes this finding, it must then consider whether it is in the best interests of the child that parental rights be terminated. See 705 ILCS 405/2—29(2) (West 2000). Although section 1(D) of the Adoption Act sets forth several grounds under which a parent may be found unfit, any one ground is sufficient, if properly proven, to enter a finding of unfitness. See 750 ILCS 50/1(D) (West 2000); *In re D.L.*, 191 Ill. 2d 1, 8 (2000).

■ Respondent argues that the court erred in finding him unfit under section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2000)). That section applies where the parent is incarcerated as a result of a criminal conviction at the time the motion for termination of parental rights is filed; the parent has been repeatedly incarcerated as a result of criminal convictions; and the parent's repeated incarceration has prevented him from discharging his parental responsibilities for the child. 750 ILCS 50/1(D)(s) (West 2000).

A finding of unfitness under subsection (s) is warranted where

repeated incarceration has prevented the parent from providing his or her child with the necessary emotional and financial support and stability required of a parent. *In re M.P.*, 324 Ill. App. 3d 686, 693 (2001). Subsection (s) may be utilized regardless of the parent's efforts, interest in his child, or satisfactory attainment of goals. *In re M.M.J.*, 313 Ill. App. 3d 352, 355 (2000).

Respondent contends that he attended to Andrea D.'s needs during the first month of her life and that, while incarcerated, he obtained a parenting certificate and participated in GED classes. He further points out that he sent numerous letters to inquire about his daughter.

■ We conclude that the trial court's finding of unfitness was not against the manifest weight of the evidence. Respondent has a history of repeated incarceration. His most recent incarceration occurred after Andrea D. was born and was based on acts committed after her birth. Respondent's incarceration has prevented him from discharging his parental responsibilities. As the trial court indicated, respondent was incarcerated for 11 months during the first year of Andrea D.'s life. He was incarcerated or involved in criminal activities for all but 1 of the last 14 years. See *In re D.D.*, 196 Ill. 2d 405, 420-21 (2001) (court may consider incarcerations that took place before the child's birth). Moreover, as the trial judge correctly asserted, respondent was unable to provide emotional or financial support or stability to his daughter due to his repeated incarceration. Additionally, the evidence showed that respondent had anger management issues and lied to receive preferential treatment. The finding of unfitness was not against the manifest weight of the evidence.

■ Respondent challenges the other bases upon which the trial court found him unfit. Because parental rights may be terminated upon proof of a single ground for unfitness (*D.L.*, 191 Ill. 2d at 8), we do not consider whether respondent was unfit on other grounds.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

McLAREN and GROMETER, JJ., concur.