2020 IL App (2d) 200335-U cons.
No. 2-20-0335
Order filed October 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.M. and A.M., Minors | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| | ) | |
| | ) | |
| | ) | No. 18-JA-21 |
| | ) | No. 18-JA-20 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. William M., Respondent- | ) | Melissa S. Barnhart, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The Appellate Court held that (1) the trial court's admission of Am.M.'s medical records into evidence was not error; (2) defense counsel was not ineffective for failing to object to the admission of the minor's medical records; and (3) the trial court's adjudication of the minors as wards of the court was affirmed where the court found the State's expert more credible than the defense expert and that finding was not against the manifest weight of the evidence.

¶ 2     Respondent, William M., appeals an order of the circuit court of Kendall County adjudicating the minors, A.M. (Am.M.) and A.M. (Az.M.), wards of the court. This court ordered the cases consolidated for purposes of briefing, argument (if called), and decision. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4     William is both children's biological father. Brittany P. is the biological mother.[1] In September 2018, Am.M. was approximately three months old, and Az.M. was approximately a year old. On September 17, 2018, the State filed petitions for adjudication of wardship as to both minors. As to Am.M., the petition alleged in count I that she was an abused and neglected minor (705 ILCS 405/2-3(2)(i) (West 2018)) in that she sustained an injury other than by accidental means, that being an acute and subacute subdural hemorrhage of the brain. In count II, the petition alleged that Am.M. was a neglected minor (705 ILCS 405/2-3(1) (West 2018)) in that her environment was injurious to her welfare. The petition further alleged that it was unknown how the injury to Am.M. was caused or by whom. As to Az.M., the State alleged that she was a neglected minor (705 ILCS 405/2-3(1) (West 2018)) under the theory of anticipatory neglect, in that Az.M. resided in the home where Am.M. received the brain injury. The trial court cases were not consolidated, although they were heard together. On September 17, 2018, the court granted guardianship of both minors to the Illinois Department of Children and Family Services (DCFS) with authority to place the minors.

¶ 5     The adjudicatory hearing was held on December 13, 2019, January 28, 2020, January 31, 2020, and February 21, 2020. The following testimony and evidence were adduced at the hearing.

¶ 6                             A. The State's Case-In-Chief

---

[1] We will refer to William and Brittany collectively as the "parents."

¶ 7                    1. *The DCFS and Police Investigations*

¶ 8     On September 10, 2018, DCFS received a "hotline" report that Am.M. was in Rush University Hospital (Rush) in Chicago with a head injury. On that date, DCFS investigator Erica Anderson spoke with Brittany by telephone. Brittany told Anderson that Brittany and Am.M.'s father, William, were Am.M.'s only caretakers. Brittany denied any incident that could have caused Am.M.'s head injury. Brittany expressed concern about the use of forceps during Am.M.'s delivery. However, at Am.M.'s two-week checkup, everything was fine. Brittany said that Am.M. was a fussy baby who wanted to be held.

¶ 9     On September 11, Anderson met with Brittany and her mother, Lorilyn Hernandez, at Hernandez's home in Montgomery, Illinois. Brittany and the minors were living there with Hernandez and Hernandez's boyfriend. Anderson observed the home to be "neat and clean" with no signs of abuse or neglect or hazardous conditions. Brittany occupied one bedroom with the two minors, who had their own beds.

¶ 10     On September 11, Brittany related the following to Anderson. On September 7, 2018, Brittany took Am.M. to the Rush-Copley emergency room in Aurora. Am.M. was not eating, was "spitting up," and she was not acting normally. Am.M. was sent home with a suppository. Brittany was concerned, because the suppository was for a two-year-old child, but she administered it to Am.M. as directed. The next day, September 8, Brittany noted that Am.M. was blue and that she was "twitching." Brittany again took Am.M. to the Rush-Copley emergency room. A CT scan revealed bleeding on Am.M.'s brain. Am.M. was transferred immediately to Rush.

¶ 11     On September 13, 2018, Anderson met with William. William told Anderson the following. During the week before September 7, William was taking care of Am.M. alone at his home in Chicago. William denied any incidents that could have caused Am.M.'s injury. Next,

Anderson spoke with Am.M.'s physician. After that conversation, DCFS took Am.M. into protective custody.

¶ 12    On September 14, 2018, DCFS advised the Montgomery Police Department that Am.M. was abused. Officer William Novak spoke with Brittany on September 17. Brittany told Novak that she initially took Am.M. to the emergency room because she was not eating and was tired. Brittany also told Novak that Am.M.'s left leg, arm, and eye were "twitching." Brittany believed that the doctor's use of forceps during delivery caused this condition. Brittany told Novak that the doctors at the emergency room diagnosed seizures. Then, at Rush, the doctors said that Am.M. had a hemorrhage on her brain. According to Novak, Brittany denied any history of violence in the home. Brittany told Novak that she lived with her mother, stepfather, and brother, and that no one except Brittany cared for Am.M. Brittany denied that she ever left home. Brittany told Novak that Am.M.'s father lived in the "city" and that he visited but was never alone with Am.M. Brittany denied that she and Am.M. ever visited William in the city.

¶ 13    Detective Sergeant Jeff Ricedorf of the Montgomery Police Department interviewed William in September 2018. William told Ricedorf the following. On September 5, 2018, Brittany told William that Am.M. was not eating, was "lethargic," and very tired. William agreed that Brittany should take the baby to the emergency room. William believed that Am.M.'s head injury was caused from the use of forceps at her delivery. William stated that he stayed in Chicago and visited the house in Montgomery "occasionally." William denied any incidents after Am.M.'s birth that could have caused her head injury.

¶ 14                    2. *Testimony of Lorilyn Hernandez*

¶ 15    Hernandez testified that in September 2018 her household consisted of herself, her fiancé, her son, Brittany, Am.M., and Az.M.. William visited two or three times a month but did not stay

with them. On or about September 5, 2018, Hernandez noticed that Am.M. was spitting up and that her bowels had not moved in a couple days. On September 7, Hernandez accompanied Brittany and Am.M. to the emergency room. Am.M. was discharged home, and the next day, Hernandez noticed Am.M. having quite a few "seizure-like episodes" in which Am.M.'s eyes rolled back and fluttered side-to-side. She also noticed that Am.M. was shaking on her left side. Hernandez and Brittany took Am.M. to the emergency room. From there, Am.M. was transported to Rush.

¶ 16    Hernandez testified that within two weeks prior to this incident, Brittany and the children were visiting William in Chicago for a couple of days. No one at Hernandez's home cared for Am.M. other than Brittany and herself. Hernandez denied that Am.M. suffered any falls or injuries prior to September 7.

¶ 17                    3. *Admission of the Medical Records into Evidence*

¶ 18    After Hernandez's testimony concluded, the State moved pursuant to section 2-18(4)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(a) (West 2018)) to admit into evidence as a business record its Exhibit 2. Exhibit 2 consisted of over 900 pages of Am.M.'s Rush medical records. When the State offered the records into evidence, William's counsel stated: "No objection, Your Honor." Brittany's counsel also had no objection, and the court admitted the records into evidence.

¶ 19                    4. *Testimony of Dr. Margaret Scotellaro*

¶ 20    Doctor Margaret Scotellaro was Am.M.'s treating physician at Rush. Scotellaro was employed as a pediatrician and assistant professor at Rush. She was also a consultant medical director to DCFS. She is board certified in general pediatrics and in child abuse pediatrics. She had been qualified as an expert witness between 15 and 20 times.

¶ 21    Scotellaro met Am.M. when she was asked by a doctor on the pediatric intensive care unit

to consult on the case. Scotellaro testified that she looked at MRIs, CT scans, and X-rays daily. She also relied on the official readings of the neuroradiologists. Am.M.'s scans showed acute, subacute, and chronic subdural hematomas, bleeding within the brain itself, and multiple retinal hemorrhages in her left eye. Scotellaro worked with a team of physicians to determine the cause of Am.M.'s injuries. Specifically, a hematologist checked for blood disorders, such as bleeding and clotting, but Am.M.'s tests were normal.

¶ 22    Scotellaro spoke with Brittany on September 10, 2018. Brittany described Am.M. as "colicky" and "fussy." At the emergency room, Am.M. was diagnosed with constipation, and she was given a suppository. Later that day, according to Brittany, Am.M. began shaking on her left side. Brittany said that the next day, Am.M. had another shaking episode during which Brittany noticed a change in Am.M.'s facial features. Brittany took Am.M. back to the emergency room. Brittany denied that Am.M. had suffered any falls or injuries. Brittany told Scotellaro that she and William were living together and that there were no other caretakers for Am.M.. When Scotellaro spoke with William, he denied that Am.M. had suffered any injuries or that he or Brittany had hurt her.

¶ 23    Scotellaro testified that she physically examined Am.M. in the intensive care unit, where Am.M. was on a ventilator. Except for Am.M.'s brain injury, the exam was normal. Dr. Scotellaro testified that she and her team concluded that the cause of Am.M.'s condition was "traumatic brain injury," after having ruled out everything else. Scotellaro testified that, within a reasonable degree of medical certainty, Am.M. had a "traumatic brain injury caused by child abuse," which formerly was called "shaken baby syndrome." Scotellaro testified that Am.M.'s injuries were "classic" for this. According to Scotellaro, half of the cases of traumatic brain injuries that she had seen involved no broken bones or other external injuries. Scotellaro opined, based on Am.M.'s MRI, that Am.M.

did not suffer a venous stroke.

¶ 24    On cross-examination, Scotellaro agreed that Am.M. had no external bruising. However, Scotellaro qualified that Am.M.'s injuries showed "chronicity," indicating that any bruising could have healed by the time that Scotellaro observed Am.M.. Scotellaro also agreed that a differential diagnosis is arrived at by excluding other conditions. Scotellaro testified that the blood clotting tests that were recommended by the radiologist were not performed because they were ruled out by the expert hematologist, who consulted on Am.M.'s care and determined, clinically, that those tests were not needed. Scotellaro testified that she and her team saw no indication that Am.M. had a stroke. Scotellaro could not tell whether Am.M. was shaken or received a blow to her head.

¶ 25    On cross-examination, Scotellaro expanded on her connection to DCFS. One of her duties as medical director was to consult for medical services for children who are in DCFS's custody. Scotellaro also had reviewed other hospitals' determinations of child abuse for DCFS on two occasions.

¶ 26    On redirect examination, Scotellaro testified that she relied on the entire team of medical professionals who saw or treated Am.M. in forming her opinions. Scotellaro also testified that Am.M.'s MRI exhibited no signs of a stroke. After Scotellaro's testimony, the State rested.

¶ 27                    B. The Defense Case-In-Chief

¶ 28                    1. *The Testimony of Dr. Joseph Scheller*

¶ 29    Scheller is a board-certified physician, who is licensed in Maryland and New Jersey, with a specialty in child neurology and a subspecialty in neuroimaging. Scheller is in private practice in Baltimore. Scheller reviewed all of Am.M.'s medical records, including her CT scans, MRIs, and other radiographic images. With respect to a CT scan of September 8, 2018, Scheller noted several very small blood clots "adjacent" to Am.M.'s brain surface on either side. These blood

clots were "acute," meaning that they occurred within a "few" days of the imaging. Scheller also noted the presence of a subdural hygroma, which is a collection of fluid that was a complication of Am.M.'s birth. There were drops of blood in the fluid. Scheller opined that this collection of fluid was not a chronic subdural hematoma, because (1) a surgeon drained it and found fluid rather than old blood, and (2) Am.M. had no history of a head or brain injury.

¶ 30    Scheller next testified regarding an MRI of Am.M.'s brain taken on September 10, 2018. He noted a blood clot caused by a stretched blood vessel. According to Scheller, the clot could have been caused by abuse, but "you would want to look for other evidence of that, like scalp or skull injury, neck injury, [or] bodily injury." In the absence of injury, Scheller testified, one would be skeptical that abuse occurred. Scheller opined that the radiographic images showed no evidence that Am.M. was struck or shaken. Scheller testified that the very small blood clots were called venous thrombosis, or blood clots within veins. Scheller testified that blood clots within veins are strokes. He opined that Am.M. had several "very, very small" strokes caused by excessive blood clotting. Scheller testified that the radiologist at Rush who noticed the blood clots recommended a series of tests designed to show whether Am.M. had a clotting disorder, but the hematologist ordered tests for the opposite problem, excessive bleeding. Therefore, according to Scheller, excessive clotting was never ruled out. Scheller testified that there was a duty to clinically rule out a clotting disorder. According to Scheller, because the Rush doctors did not rule out a clotting disorder, their differential diagnosis was incomplete.

¶ 31    Scheller described petechial hemorrhages in Am.M.'s eye as drops of blood that leaked from her clotted veins. Scheller testified that those hemorrhages were indicative of bleeding in the brain rather than abuse from shaking. Scheller testified, to a reasonable degree of medical certainty, that all of Am.M.'s findings could be attributed to something other than abuse.

¶ 32    On cross-examination, Scheller testified that he was not currently affiliated with any hospitals. He obtained his board certifications in pediatrics and neurology before continuing examinations were required, and he had not availed himself of continuing education to update his certifications. Scheller estimated that he testified 200 times in abuse or shaken baby cases, always for the defense.

¶ 33    Scheller testified that he saw an acute subdural hematoma on Am.M.'s films. He did not see a subacute or chronic subdural hematoma. Because he did not see evidence that Am.M. was born with a blood vessel abnormality, nor did he find infection, bleeding disorder, or trauma, Scheller diagnosed the cause of Am.M.'s seizures as venous stroke.

¶ 34    Scheller testified that he disagreed with the term "abusive head trauma," as being too vague. Scheller believed that acceleration-deceleration injuries could be caused by a caregiver only to very young infants—one or two months old. Scheller admitted that this view was shared by only five percent of his peers. In rejecting the term "abusive head trauma," Scheller acknowledged that he was "at odds" with the American Academy of Pediatrics and the American Board of Pediatrics. Scheller testified that he disagreed with every doctors' organization that accepted the use of the term "abusive head trauma." Scheller testified that he also rejected the notion that a diagnosis of abuse could conclusively be established absent physical findings such as broken bones. Scheller testified that it is a "commonly held belief" among ophthalmologists that retinal hemorrhaging is an indicator of abuse, but he disagrees that such hemorrhages are "useful in any way" in determining whether a baby was subject to abuse.

¶ 35    On redirect examination, Scheller testified that his continuing medical education consists of reading journals and occasionally attending seminars. According to Scheller, Am.M.'s seizures were caused by "a little bit of blood that was irritating the surface of the brain."

¶ 36                    2. *The Testimony of Brittany P.*

¶ 37    On September 7, 2018, Brittany took Am.M. to the emergency room because Am.M. was lethargic, not eating properly, and vomiting. Am.M. was diagnosed with constipation and given a suppository. Upon discharge, Brittany was instructed to give Am.M. Enfalyte. The next day, Am.M. still was not eating well. After Brittany administered the Enfalyte, Am.M.'s left arm and leg began twitching, and Am.M. began "blinking." That episode lasted about 10 seconds. Then, Am.M. had more episodes, and Brittany asked Lorilyn to witness what was happening. Brittany immediately took Am.M. to the emergency room. From there, Am.M. was transported to Rush.

¶ 38    Brittany testified that Am.M.'s head at birth was bruised and her left eye was "bulging" and bloodshot. Brittany identified two photographs of Am.M. at two weeks of age, which Brittany said depicted the bruising and bulging of the eye.

¶ 39    At Rush on September 8, Brittany spoke with hospital staff. Brittany did not mention that her father and grandfather had a history of strokes because the hospital personnel never asked her about that.

¶ 40    Brittany testified that about five-to-ten days before September 7, she, Az.M., and Am.M. visited William in Chicago, where he was living with his grandmother. They stayed with William about four hours. During that time, there were periods when Brittany was not watching Am.M.. According to Brittany, she had advised William on September 6 that Am.M. was not feeling well.

¶ 41    Brittany testified that she did not live with William in September 2018. She lived in Montgomery with her mother, her stepfather, her oldest brother, Az.M., and Am.M.. Brittany was Am.M's primary caregiver. Brittany never saw any family members abuse Am.M.. Brittany testified that neither she nor William ever abused Am.M..

¶ 42    On cross-examination, Brittany testified that she had no safety concerns about William

being with the children. She also testified that, when she noticed Am.M's bruising and protruding eye at two weeks of age, she did not take Am.M. to the doctor because she did not have a car or a babysitter. Brittany acknowledged telling her social worker and Scotellaro that Am.M. was a fussy, colicky baby. Brittany testified that she believed that Am.M.'s injuries were caused by forceps at birth. According to Brittany, she was asked at the hospital about a family history of strokes but not about blood disorders. Brittany clarified that her father had a stroke after Am.M.'s hospitalization in September 2018, and she did not know about her grandfather's stroke when she was interviewed at the hospital on September 8. Brittany testified that she told hospital personnel that Am.M. first suffered seizures on September 8. At the conclusion of Brittany's testimony, the defense rested. The State presented no rebuttal. The parties submitted written closing arguments.

¶ 43                    C. The Court's Findings and Order

¶ 44    On April 24, 2020, the court entered a 16-page typewritten order. After reciting the trial testimony in minute detail, the court noted that the Rush medical records indicated the following. Brittany told three different doctors and a social worker, in separate interviews, that she, Am.M., and Az.M. were living with William and that no one other than the parents cared for Am.M.. Brittany stated that Lorilyn watched Az.M.. Brittany told the social worker that the cause of Am.M.'s injuries was lack of adequate oxygen at birth. Brittany also stated that Am.M. pulled her hair quite hard. Brittany stated to Scotellaro and another physician that Am.M. had two seizures on the night of September 7.

¶ 45    The court noted that the State's petition for adjudication of wardship did not allege who was responsible for inflicting Am.M.'s injuries. The court further noted that the State was not required to prove that a specific person participated in the abuse that gave rise to the petition.

¶ 46    The court found that Scotellaro based her opinion that Am.M. suffered abusive head trauma

on her education, training, and expertise as a child abuse pediatric physician and after consultation with numerous other experts, notably a neuroradiologist and a hematologist. The court noted that it had the opportunity to assess Scotellaro's "candor and credibility." The court found that Scotellaro had been declared an expert approximately 15-to-20 times.

¶ 47    The court rejected the parents' argument that Scotellaro's position as medical director for DCFS tainted her independence. The court found no conflict in Scotellaro's positions as a treating physician and DCFS medical director. The court noted that Scotellaro's job was not to "generate business for DCFS * * *."  The court also noted that Scotellaro did not charge a fee for her testimony.

¶ 48    The court found the parents' argument that abuse did not occur because Am.M. had no other internal or external injuries to be without merit. The court relied on Scotellaro's testimony that half of the abuse cases the doctor had seen involved no other internal or external injuries. The court also relied on Scotellaro's testimony that it was possible that any bruises had healed by the time Am.M. presented at Rush.

¶ 49    The court also rejected the parents' argument that Rush did not test for a clotting disorder, and, thus, failed to rule it out as a cause of Am.M.'s injuries. The court again relied on Scotellaro's testimony that, although a radiologist had recommended such tests, the hematologist disagreed based upon her clinical evaluations of Am.M.. The court rejected Brittany's explanations of forceps and lack of oxygen as the causes of Am.M.'s injuries, as neither of those theories was supported by any medical evidence.

¶ 50    Next, the court found the Rush medical records "compelling," while the court found Scheller's testimony to be not credible. The court noted that Scheller had not participated in the maintenance of his certifications and did not attend seminars to keep current. The court further

noted that Scheller "shunned" "what 95% of medical professionals have accepted as abusive head trauma." The court also found that Scheller "dismissed" the diagnoses of Scotellaro and the "entire Rush team of specialists," including the hematologist. The court found, considering the children's best interests and the evidence, that Am.M. was an abused and neglected minor. Based on that finding, the court found that Az.M. was also a neglected minor. The court entered both an adjudicatory order and a dispositional order.

¶ 51     William filed a motion to reconsider, which was denied. William then filed a timely notice of appeal.

¶ 52                                    II. ANALYSIS

¶ 53     William first contends that the court erred in admitting the medical records into evidence. The court admitted the medical records into evidence, without objection, pursuant to section 2-18(4)(a) of the Act, which makes such records admissible as business records when accompanied by a certificate from the head of the hospital or responsible employee stating that the records are the full and complete record of the reported condition, act, transaction, occurrence, or event. 705 ILCS 405/2-18(4)(a) (West 2018). That section further provides that a certification by someone other than the head of the hospital shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital and by such other employee. 705 ILCS 405/2-18(4)(a) (West 2018).

¶ 54     Because William did not object to the admission into evidence of the medical records, he argues that their admission can be reviewed under the plain-error doctrine. The admission of evidence is within the trial court's sound discretion, and we will reverse that decision only if it is arbitrary, fanciful, and unreasonable, such that no reasonable person would agree with it. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 16. The plain-error doctrine permits the appellate court

to review unpreserved error where (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred, which was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of whether the evidence was closely balanced. *People v. Holliday*, 2020 IL App (5th) 160547, ¶ 61. The plain-error doctrine can be applied in abuse and neglect cases. *In re Andrea D.*, 342 Ill. App. 3d 233, 242 (2003). William asks us to review this issue under both prongs of the plain-error doctrine. We first, however, must decide whether error occurred. *Holliday*, 2020 IL App (5th) 160547, ¶ 62.

¶ 55    Here, the certificate is not on letterhead identifying the institution that generated the records. The document references Am.M.'s name, date of birth, trial court case number, and the number of pages "enclosed." The body is typewritten and states: "I, Amanda Ritzler, certify that all records have been provided all providers from all DOS, as requested." Amanda Ritzler's signature follows the typewritten material. A telephone number and the date of the document are also provided. The certificate does not identify Amanda Ritzler's position. The body does not identify what the records are to which it refers. The content, really, is meaningless. Nevertheless, the State argues that the certificate, when read in conjunction with the medical records themselves, demonstrates compliance with the Act. The State relies on this court's decision in *In re Z.J.*, 2020 IL App (2d) 190824, for the proposition that compliance with the statute can be determined from examining the records themselves.

¶ 56    In *Z.J.*, DCFS service plans were admitted into evidence without the certificate required by section 2-18(4)(a). *Z.J.*, 2020 IL App (2d) 190824, ¶ 55. This court held that, absent certification, the State can satisfy the statute's foundational requirements by establishing that the writings were

made (1) as a memorandum or record of the event, (2) in the regular course of business, and (3) at the time of the event or within a reasonable time thereafter. *Z.J.*, 2020 IL App (2d) 190824, ¶ 55. To determine whether a sufficient foundation was established, this court then examined the service plans. *Z.J.*, 2020 IL App (2d) 190824, ¶¶ 57-61.

¶ 57 Upon examination of the medical records in the instant case, we determine that section 2-18(4)(a)'s foundational requirements were met. Each record contains the Rush logo, and the records clearly pertain to Am.M.. Each record details the medical service rendered, the date and time of the service, by whom the service was rendered, and the date and time that the record was filed. The records demonstrate that they were generated close to, or within hours, of the events recorded. Accordingly, we determine that the court did not abuse its discretion in admitting the Rush medical records. Because we find no error, there is no plain error.

¶ 58 William next argues that his counsel was ineffective for failing to object to the admission of the medical records where the certificate did not comply with the statute. To demonstrate ineffective assistance of counsel, a defendant must show that (1) his attorney's conduct fell below an objective standard of reasonableness, and (2) the attorney's performance prejudiced the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 90. The defendant's failure to satisfy either prong of the test defeats his or her claim. *Jackson*, 2020 IL 124112, ¶ 90. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Ineffective-assistance-of-counsel claims are cognizable in juvenile proceedings. *In re K.O.*, 336 Ill. App. 3d 98, 110 (2002). Whether to object to the foundation for the admission of evidence is generally a matter of trial strategy. *People v. Probst*, 344 Ill. App. 3d 378, 387 (2003). As a matter of trial strategy, failure to object does not necessarily establish deficient performance. *Probst*, 344 Ill. App. 3d at 387. Here, counsel's performance did not fall

below an objectively reasonable standard, because, as we determined, a sufficient foundation for the admission of the medical records into evidence existed despite the inadequate certificate. As a matter of trial strategy, defense counsel did not object to the records but presented his own expert who explained why, in his opinion, Rush's records demonstrated that the State's expert came to her opinions without sufficient underlying data. Therefore, the admission of the Rush records was essential to an understanding of the defense expert's testimony. Accordingly, we hold that defendant's counsel was not ineffective.

¶ 59    William next argues that the court's finding that Am.M. was neglected and abused is against the manifest weight of the evidence. The State must prove allegations of abuse and neglect by a preponderance of the evidence. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47. The trial court is in the best position to observe the demeanor and conduct of the witnesses and is, therefore, in the best position to determine their credibility and the weight to be given to their testimony. *Davon H.*, 2015 IL App (1st) 150926, ¶ 47. We will not reverse a trial court's finding of abuse and neglect unless it is against the manifest weight of the evidence. *Davon H.*, 2015 IL App (1st) 150926, ¶ 47. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Davon H.*, 2015 IL App (1st) 150926, ¶ 47.

¶ 60    William contends that the court abused its discretion in relying on the medical records, which he argues were inadmissible. Therefore, William argues, the court's findings were against the manifest weight of the evidence. As we have determined that the medical records were properly admitted into evidence, this argument has no merit.

¶ 61    William next argues that the court erred in giving any weight to the Rush medical records because (1) they were inadmissible, (2) the Rush radiologist did not testify and was not certified by the court as an expert, and (3) the medical records were hearsay and not substantive evidence,

so that the court's reliance on the them as substantive evidence was error. We have determined that the records were admissible as a business record pursuant to section 2-18(4)(a) of the Act. Business records are an exception to the hearsay rule. *Troyan v. Reyes*, 367 Ill. App. 3d 729, 733 (2006). Like other business records, medical records are inherently reliable because they are generated by individuals who have no motive to lie and who must rely on their accuracy. *Troyan*, 367 Ill. App. 3d at 734. Consequently, diagnoses and opinions contained in medical records are admissible to the same extent as objective facts, because a diagnosis is the "major premise" from which a physician draws his or her conclusion as to the proper treatment to be given. *Troyan*, 367 Ill. App. 3d at 734 (quoting *Falcone v. New Jersey Bell Telephone Co.*, 236 A.2d 394, 400 (N.J. 1967)). The same indicia of reliability apply to opinions contained in medical records because the "opinions are worthless unless accurate." *Troyan*, 367 Ill. App. 3d at 734. Accordingly, we hold that the court did not err in considering the Rush medical records as substantive evidence, and, more particularly, in relying on the Rush radiologist's findings and conclusions.

¶ 62    William asserts at length in a well-presented argument that the court erred in giving Scotellaro's testimony more weight than Scheller's. However, when confronted with a battle of the experts, *i.e.*, different experts examining roughly the same information and arriving at opposite conclusions (see *People v. Smith*, 253 Ill. App. 3d 443, 446-47 (1993) (describing a battle of arson experts), it is "for the trier of fact to evaluate the expert testimonies and weigh their relative worth in context." *People v. Sims,* 374 Ill. App. 3d 231, 251 (2007). Thus, the court was not required to accept Scheller's testimony over Scotellaro's. On appeal, we will not reweigh the experts' testimonies based on their qualifications. See *Sims*, 374 Ill. App. 3d at 251 (the appellate court will not reweigh expert evidence based on the experts' qualifications). Here, the court gave no weight to Scheller's opinions, finding that (1) Scheller did not maintain his professional certifications or

keep current through attending seminars, and (2) Scheller "shunned" "what 95% of medical professionals have accepted as abusive head trauma." Indeed, Scheller admitted that he was out of the mainstream of medical and academic thought on the subject. On this record, we cannot say that the court's rejection of Scheller's testimony was against the manifest weight of the evidence.

¶ 63 Next, William contends that the court's finding that Az.M. was a neglected minor is against the manifest weight of the evidence. The court's finding was based on the theory of anticipatory neglect. Pursuant to the anticipatory-neglect theory, the State seeks to protect, not only those children who are direct victims of abuse or neglect, but also those children who have a probability of being abused or neglected because they reside with an individual who has neglected or abused another child. *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). The theory of anticipatory neglect is premised on the concept of "injurious environment." *Arthur H.*, 212 Ill. 2d at 468. The Act provides that a juvenile court should not be prohibited from acting until each particular child suffers injury. *In Interest of L.W.*, 291 Ill. App. 3d 619, 623 (1997). Thus, a finding of abuse of one sibling establishes a *prima facie* case of neglect based on injurious environment to another sibling. *K.O.*, 336 Ill. App. 3d at 108-09. William's sole argument with respect to Az.M. is that the State failed to prove by a preponderance of the evidence that Am.M. was abused. As we have rejected that argument, the instant contention also is without merit. Accordingly, we hold that the trial court properly adjudicated both minors wards of the court.

¶ 64                                    III. CONCLUSION

¶ 65 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 66 Affirmed.