*In re* RUEBEN STIARWALT *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Jeanne Stiarwalt, Respondent-Appellant).

Second District   No. 2—88—1141

Opinion filed October 24, 1989.

Harlovic & Perko, of West Dundee (Phyllis J. Perko, of counsel), for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, and Eleesha Pastor O'Neill, of counsel), for the People.

Patricia Reid Lindner, of Aurora, guardian *ad litem.*

JUSTICE INGLIS delivered the opinion of the court:

Respondent, Jeanne Stiarwalt, mother of Rueben (a/k/a Rubin), Julio, and Rachel (a/k/a Rachael) Stiarwalt, appeals from an order of the circuit court of Kane County terminating her parental rights and authorizing the guardianship administrator of the Illinois Department of Children and Family Service (DCFS) to consent to the minors' adoption. Respondent contends that (1) the trial court proceedings did not comply with the requirements of the Indian Child Welfare Act of 1978 (Act) (25 U.S.C. §1901 *et seq.* (1982)); and (2) the trial court's finding of parental unfitness was not supported by clear and convincing evidence. We affirm.

On June 23, 1983, the State filed a petition for an adjudication of wardship based on the neglect of the three minor children, Rueben (born November 24, 1975), Julio (born April 30, 1979), and Rachel (born October 7, 1981). On August 9, 1983, the court granted the petition. However, on July 17, 1984, the court vacated the adjudication and set the cause for a hearing. On September 10, 1984, an adjudication hearing was held at which respondent entered an admission to the contents of the State's petition based on the fact that she was unable to provide the necessary care and support of the children. On the same date, the court entered an order placing six conditions upon respondent for a return of her children. These six conditions were that respondent would obtain adequate housing, maintain regular contact with DCFS, continue scheduled visitation with the children, be gainfully employed, attend counseling, and maintain a stable home environment for a three-month period.

On October 22, 1985, the State filed a petition to terminate respondent's parental rights with respect to the three minor children. The petition alleged that respondent was unfit due to her failure to make reasonable efforts and progress to correct the conditions which

were the basis for the removal of the minor children from her custody. On September 25, 1986, after two fitness hearings, the court entered an order finding that the State proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of her children. The court then ordered a hearing to determine whether the termination of respondent's parental rights would be in the best interests of the minor children.

On January 5, 1988, respondent filed a motion to invalidate the court proceedings, including the adjudicatory and unfitness hearings and findings, based on the allegation that the court lacked jurisdiction in this case. Respondent argued that she was a member of an Indian tribe, that the minors were Indian children, and, as such, that the Act applied in this case. On March 30, 1988, a hearing was held on respondent's motion. At the conclusion of the hearing, the court took the matter under advisement. On July 19, 1988, the court entered an order denying respondent's motion to invalidate, finding that the Act was inapplicable in the case at bar.

On October 31, 1988, an evidentiary hearing was conducted to determine what placement would be in the best interests of the minor children. The hearing concluded on November 1, 1988, after which the court ordered that the termination of respondent's parental rights would be in the best interests of the children. The court also appointed a guardian to consent to the minors' adoption. Respondent filed a timely notice of appeal.

On appeal, respondent first contends that the trial court proceedings did not comply with the requirements of the Act. Specifically, she contends that there is a possibility that the Canadian tribe of which she is a member is affiliated with some Sioux Indian tribe within the United States and recognized by the Department of the Interior (Department). She further contends that the State had an obligation to contact respondent's Indian tribe to determine whether the tribe claims some affiliation with a tribe recognized by the United States government.

During the hearings on the termination of respondent's parental rights, respondent filed a motion to invalidate the proceedings, contending that the State did not comply with the provisions of the Act. An evidentiary hearing was held on respondent's motion. At the hearing, Nancy Zimmerman, a DCFS caseworker, testified that DCFS was aware of respondent's Indian heritage and attempted to determine if the Act applied to respondent and her children. Zimmerman stated that a letter was written to the Department requesting advice on the applicability of the Act. In the letter, DCFS informed the Department

that respondent was born in Canada and "appears to be part of a Sioux Indian Tribe." DCFS also enclosed a copy of respondent's birth certificate with the letter. The Department responded by stating:

"From the information which you provided, it appears that these [Stiarwalt] children possess only Indian blood from Tribes in Canada. This Act (PL—95—608) applies only to children of Indians who are members of an Indian Tribe recognized by the United States Government and who are themselves eligible for membership. It appears that these children do not meet this requirement of the Act. Therefore, the Act would not apply to these children."

After receiving the letter, DCFS concluded that it would not be necessary to comply with the procedural requirements of the Act because the Act would not apply in this case.

Respondent also testified at the hearing. She stated that she was born in 1960 on the Rolling River Band Indian Reservation in Canada. She was placed in a foster home at age seven and was adopted at age 10 by a non-Indian family in Illinois. She stated that she has not lived on an Indian reservation since she was adopted. Respondent also introduced a letter from the Rolling River Band into evidence at the hearing. The letter was written to respondent's attorney and stated:

"[Y]our client [respondent] and her children are entitled to Treaty Status and Canadian Citizenship and should be treated as such."

The trial court determined that the Act was not applicable to the case at bar, stating:

"The evidence introduced at the evidenciary [sic] hearing establishes clearly that the Mother is a member of a Canadian Indian Tribe. The evidence established that Leona Angella McKay, which was the Mother's birth name, was a member of the Rolling River Band of Canadian Indians.

\* \* \*

The Rolling River Band is not recognized by the Secretary of the Bureau of Indian Affairs of the Department of the Interior. The Act as it was written and in existence at the time of the adjudications as to the Stiarwalt Minors did not include Canadian Indians. It is the finding of this Court, therefore, that the Act is not applicable to these proceedings and the Motion To Invalidate is denied."

■ The Act was adopted to respond to a crisis occurring in Indian tribes in which large numbers of Indian children were being separated from their families and placed in non-Indian homes. (*Missis-*

*sippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 32, 104 L. Ed. 2d 29, 36, 109 S. Ct. 1597, 1600.) As a result, the children were being deprived of their cultural heritage, and the tribes' ability to function as an autonomous community was being severely threatened. (490 U.S. at 35-36, 104 L. Ed. 2d at 37-38, 109 S. Ct. at 1601.) The Act incorporated these considerations, finding:

"(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. §§1901(3) through 1901(5) (1982).

The Act sets forth minimum Federal standards for the removal of an Indian child from his or her family. (25 U.S.C. §1902 (1982); *In re A.E.* (Colo. App. 1987), 749 P.2d 450, 451.) However, the Act does not apply unless it is established that the child is an "Indian child." (*In re Appeal in Maricopa County Juvenile Action No. A—25525* (1983), 136 Ariz. 528, 531, 667 P.2d 228, 231.) The Act defines "Indian child" as:

"[A]ny unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. §1903(4) (1982).)

The Act goes on to define "Indian tribe" as:

"[A]ny Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of title 43." (25 U.S.C. §1903(8) (1982).)

Thus, the Act does not apply merely because the children are "Indian," but applies only where there is proof that the children are members, or are eligible for membership, in an Indian tribe, as defined by the Act. *In re Smith* (1987), 46 Wash. App. 647, 650, 731

P.2d 1149, 1152-53.

■ In the present case, the State introduced evidence indicating that the children were not "Indian" within the context of the Act. Respondent argues that the State's evidence did not negate the possibility that the Canadian tribe in which she is a member is affiliated with some tribe which is recognized under the Act. However, the burden of proof is on respondent to prove that the Indian tribe in which she claims membership is recognized as eligible for services to Indians by the Department. (*In re Angus* (1982), 60 Or. App. 546, 549, 655 P.2d 208, 210, *cert. denied* (1983), 464 U.S. 830, 78 L. Ed. 2d 109, 104 S. Ct. 107; *In re K.A.B.E.* (S.D. 1982), 325 N.W.2d 840, 843.) Respondent failed to offer any evidence that the Canadian tribe is affiliated with any tribe recognized under the Act.

Respondent cites *In re Junious M.* (1983), 144 Cal. App. 3d 786, 193 Cal. Rptr. 40, to support her position that the Act applies in the case at bar. In *Junious M.*, the trial court determined that the minor child was a member of the Nooksack Tribe, but that the Act would not apply because the minor was not an "Indian child." (144 Cal. App. 3d at 792, 193 Cal. Rptr. at 43.) Apparently, the trial court based this ruling on the allegation that the Nooksack tribe was Canadian. However, evidence was also adduced at trial indicating that the tribe was also located within the United States and was recognized by the Department of the Interior. (144 Cal. App. 3d at 792, 193 Cal. Rptr. at 43.) The appellate court reversed the trial court, holding that the trial court erred when it failed to notify the Nooksack Tribe concerning the custody proceedings. (144 Cal. App. 3d at 794, 193 Cal. Rptr. at 44.) The court noted that guidelines established by the Bureau of Indian Affairs (Bureau) stated that "[a]bsent a contrary determination by the tribe that is alleged to be the Indian child's tribe, a determination by the Bureau of Indian Affairs that a child is or is not an Indian child is conclusive." 144 Cal. App. 3d at 794, 193 Cal. Rptr. at 44, citing 44 Fed. Reg. 67584-67586 (Nov. 26, 1979).

We believe that the *Junious M.* decision does not support respondent's position in the case at bar. In *Junious M.*, the Bureau informed the parties that the Nooksack Tribe was officially recognized by the United States government. Indeed, a review of the Federal register indicates that the Nooksack Indian Tribe of Washington is listed as a federally recognized tribe. (51 Fed. Reg. 25116 (July 10, 1986).) However, in the case at bar, the Bureau determined that respondent's tribe, the Rolling River Band, is not a Federally recognized tribe. The bureau made this determination after reviewing the Federal register and not finding the Rolling River Band listed as eligible for Federal

recognition. We believe that the Bureau's unrefuted determination concerning respondent's Indian status in this case is conclusive. (See *In re Tucker* (1985), 76 Or. App. 673, 678-79 n.3, 710 P.2d 793, 796 n.3; *Junious M.*, 144 Cal. App. 3d at 794, 193 Cal. Rptr. at 44.) Thus, we agree with the trial court's determination that the Act does not apply in the case at bar.

Respondent next contends that the trial court's finding of parental unfitness was not supported by clear and convincing evidence. Respondent argues that the six conditions set out for a return of her children were either not reasonably related to the question of fitness, or that the evidence did not support the court's conclusion that there was not reasonable progress toward the fulfillment of the conditions. We disagree.

■ It is well established that a finding of parental unfitness must be supported by clear and convincing evidence. (*In re Paul* (1984), 101 Ill. 2d 345, 352; *In re Henry* (1988), 175 Ill. App. 3d 778, 790.) The trial court's findings must be given great deference, and its decision should not be reversed on appeal unless it is contrary to the manifest weight of the evidence. *Henry*, 175 Ill. App. 3d at 790; *In re R.G.* (1988), 165 Ill. App. 3d 112, 133-34.

In the instant case, the minor children were taken into temporary custody in June 1983 after respondent made a telephone call to DCFS. Respondent told DCFS that she was an alcoholic and a drug addict and that she did not have a place for her and the children to live. The children were placed in three different foster homes. On July 15, 1983, respondent telephoned her DCFS caseworker, Betsy Nemeth, and told Nemeth that she was moving to Texas. Nemeth told respondent that she should schedule an appointment with DCFS before she left Illinois so that a case plan could be worked out and to allow her to visit with her children. Respondent scheduled an appointment for later in the afternoon on the same day, and a six-month client-service plan (plan) was developed. The first plan set up goals for respondent to achieve, including obtaining drug counseling and abstaining from alcohol and drug usage, finding suitable housing and maintaining stable employment.

On July 20, 1983, respondent had visitation with her children and brought a box of their clothing. Nemeth testified that respondent did not separate the clothing, even though the children were living in three different foster homes. Nemeth further stated that "the clothes were in terrible condition, that they were—most of them didn't even fit the kids, that they were dirty and that they had a terrible odor to them and the boxes had cockroaches that were in them and I believe

Julio—some of the clothes of the children's were caked with like feces and they were just very dirty."

Shortly thereafter, respondent was arrested, charged with theft, and placed in the Kane County jail (jail). Nemeth testified that she had regular contacts with respondent in August and September 1983 while respondent was at the jail. In October 1983, respondent was sentenced to 18 months' imprisonment and sent to the Dwight Correctional Center (Dwight).

On December 9, 1983, a second plan was set up for respondent and continued the goals of the previous plan due to respondent's incarceration. On April 25, 1984, respondent was released from Dwight. On May 11, 1984, respondent visited with the children and, later in the month, moved to Texas. It was respondent's intention to move the children to Texas after she had established suitable housing and employment.

On June 15, 1984, a third plan was developed for respondent. In July 1984, respondent returned to Illinois for a court hearing and to visit with the children. Respondent stayed in Illinois after the hearing and did not return to Texas. Respondent missed several scheduled visits with the children in August 1984 because she was late for the appointments. She also failed to show up for one visit in September 1984 and did not call Nemeth to inform DCFS that she would be unable to make the appointment. Nemeth further testified that respondent did not provide any verification concerning compliance with the counseling, employment or housing goals set for her in the plans.

Debra Mourning, a DCFS caseworker, testified that she took over respondent's case after Nemeth left DCFS. Mourning stated that a fourth plan was developed for respondent on December 20, 1984. This plan included a two-hour-per-week visitation schedule for respondent to be with her children. Respondent was to provide her children with a nutritional meal and was to bring toys and books for them during the visitation periods. The plan also included a goal of attending drug and alcohol counseling and obtaining adequate housing for her and the children.

On February 6, 1985, Mourning had an in-person contact with respondent at the DCFS office. Respondent stated that she was not attending counseling and was "still drinking, but not getting drunk." Respondent told Mourning that she was not attending counseling because she had too many other things to do, including baby-sitting and searching for employment. In addition, respondent stated that she was unemployed.

Respondent moved several times during January to March 1985.

On April 26, 1985, respondent informed DCFS that she was pregnant. On May 10, 1985, respondent was confronted with reports that she was drinking "heavily." Respondent did not reply but instead only cried. On June 12, 1985, a fifth plan was set up for respondent. On August 26, 1985, Mourning told respondent that no progress was being made on the plans and that a petition to terminate her parental rights would be filed. On September 23, 1985, respondent gave birth to her fourth child.

Ruth Burton, a substance abuse counselor at the Passage Program for Women (Passage), testified that she was respondent's counselor. Burton stated that respondent's attendance at the Passage counseling sessions was very erratic and that "she came in on crisis, when things were bad. She would come for a while and then not come." Burton also stated that respondent did not have "a real willingness to work on any issues."

Respondent testified at the hearing that she does not consider herself to have a drug or alcohol problem anymore and has "been clean" ever since her release from Dwight. However, she admitted that no independent drug or alcohol counselor had told her that she no longer had a drug or alcohol problem. She also stated that she has experienced problems with Frank Rodriguez, the father of Julio, which resulted in her having to spend two weeks in a woman's crisis center. In addition, respondent stated that she was unable to maintain stable employment due to a lack of transportation to get to work, and because she experienced various problems with her pregnancy.

At the conclusion of the hearing, the court determined that respondent did make a reasonable effort, but failed to make reasonable progress, toward the return of her minor children. (See Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) The court then ordered respondent's parental rights terminated. At a later hearing, the court determined that it would be in the best interests of the minor children to terminate respondent's parental rights.

The trial court made these findings after determining that respondent's one-bedroom apartment was not suitable housing for her and her four minor children. The court also determined that respondent was not gainfully employed at any particular time "so as to provide for the basic needs of the children." In addition, the court stated that respondent never regularly attended drug and alcohol counseling, thus not giving her counselor an opportunity to determine whether she needed to attend counseling at all. As a final point, the court stated that respondent did not maintain a stable home or work environment for a three-month period, as required under the last condi-

tion of the order entered at the adjudication hearing.

■■ Respondent argues that she did make reasonable progress toward satisfying the six conditions. Whether a parent's progress toward the return of the children was reasonable involves an objective determination based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. (*In re Allen* (1988), 172 Ill. App. 3d 950, 956; *In re Doolan* (1981), 101 Ill. App. 3d 322, 324.) At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification. *In re Henry*, 175 Ill. App. 3d at 791; *In re Allen*, 172 Ill. App. 3d at 956.

Respondent contends that *In re Perez* (1988), 173 Ill. App. 3d 922, supports her position that she did make reasonable progress toward the return of her children. In *In re Perez*, the trial court terminated the mother's parental rights because she failed to make reasonable progress with respect to the conditions imposed upon her at the dispositional hearing. This court reversed the trial court, holding that the absence of evidence as to the mother's status at the time of the removal of her children made it impossible for the court to determine whether the mother had in fact made reasonable progress toward the return of her children. *In re Perez*, 173 Ill. App. 3d at 936.

■■ We agree with the *In re Perez* decision and believe that it is essential for the trial court to consider the situation triggering the minor children's initial removal as a benchmark for measuring reasonable progress. (*In re Perez*, 173 Ill. App. 3d at 936; see also *In re Bennett* (1980), 80 Ill. App. 3d 207, 212; *In re Austin* (1978), 61 Ill. App. 3d 344, 350.) In the case at bar, respondent's status at the time of the removal of her children was well documented. Respondent admitted that she was an alcoholic and a drug addict and did not have a place for her and her children to live at the time the children were removed from her custody. The court took these factors into consideration when it determined that respondent did not make reasonable progress with respect to her substance abuse counseling and inability to maintain stability with respect to housing and employment. Thus, we believe that the trial court could properly determine whether respondent made reasonable progress toward the return of her children, unlike the situation in *In re Perez*.

We agree with respondent that parental rights are fundamental and cannot be lightly terminated. (*In re Paul*, 101 Ill. 2d at 352-55.) However, DCFS provided respondent with five different client-service plans, two of which were after the court entered the adjudication of neglect order, in an attempt to allow respondent to regain custody of

her children. Respondent received an "unsatisfactory" grade as to one or more of the conditions for each of the plans, including the two plans after the court order adjudicating neglect. Respondent never did regularly attend counseling and was apparently still consuming alcohol during the time she was directed to abstain from alcohol and drugs. In addition, respondent did not secure housing suitable for her and the children, even though this was one of the reasons why she originally relinquished custody of the children. While respondent may have made some slight progress during this time, the trial court's finding that she failed to make reasonable progress toward the return of her children in the nearly 14 months since the order adjudicating neglect is not contrary to the manifest weight of the evidence. See *In re A.C.B.* (1987), 153 Ill. App. 3d 704, 708-09 (some progress may not be reasonable given the right of the children to not be left in limbo for an unreasonable amount of time).

For the above stated reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and McLAREN, JJ., concur.