NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221085-U

NO. 4-22-1085

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 24, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re:* C.D., a Minor; | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 21JA129 |
| v. | ) | |
| Kendra B., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice DeArmond and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1        *Held*:  The trial court's adjudicatory and dispositional orders are affirmed.

¶ 2        On October 20, 2022, the trial court found C.D., born October 23, 2021, was a neglected minor pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) because his environment was injurious to his welfare. Specifically, the court found the environment was injurious to C.D.'s welfare because of respondent Kendra B.'s mental instability and domestic violence issues between respondent and C.D.'s father, Justin D. On November 16, 2022, the court found it to be in C.D.'s best interests to be made a ward of the court. Respondent appeals, raising a wide range of issues. We affirm.

¶ 3                            I. BACKGROUND

¶ 4        On October 26, 2021, the State filed a petition alleging C.D. was a neglected, abused, or dependent minor pursuant to section 2-3(1), (2) or 2-4 of the Act (705 ILCS 405/2-

3(1)(2), 2-4 (West 2020)). That same day, the trial court entered an order indicating the shelter care hearing had been called and then continued on the "parents' motion" until October 28, 2021, to allow C.D.'s parents time to speak with their court appointed attorneys. The court's order also indicated both parents received notice and were present. Further, the order stated C.D. had been brought before a judicial officer within the time required by section 2-9 of the Act (705 ILCS 405/2-9 (2020)) and remained in protective custody.

¶ 5        In a written order dated October 28, 2021, which was entered after the shelter care hearing, the trial court found probable cause that C.D. was neglected and that it was a matter of immediate and urgent necessity for C.D.'s protection that he be placed in shelter care. The order indicated respondent claimed she had Native American ancestry and the State would contact the department of "Native American Affairs." The next hearing was scheduled for December 22, 2021.

¶ 6        On December 22, 2021, the trial court entered an order indicating the case had come before the court for a pre-trial hearing, the investigation had been disclosed, and the case was being continued until January 26, 2022. The order does not indicate that anyone objected to the continuance. On January 26, 2022, the court entered a written order finding good cause to set the adjudicatory hearing beyond the 90-day limit on March 10, 2022, because Justin D.'s attorney was not unavailable. The order indicated the court was told no one objected to the continuance. The order also indicated respondent stated she possibly had Cherokee ancestry.

¶ 7        On March 10, 2022, the trial court continued the case again until April 21, 2022, on the State's motion because its witnesses were not available. The court's written order indicates no one objected to the State's motion.

¶ 8        On April 22, 2022, respondent's attorney made a motion to continue the adjudicatory hearing because respondent's Native American ancestry had never been addressed.

The guardian *ad litem* and the State objected to continuing the hearing. The State asked the court to question respondent about her ancestry claims. The State indicated the assigned case worker had made inquiries about tribal ties and expected a response by July.

¶ 9    The trial court then questioned respondent regarding C.D.'s ancestry. Respondent claimed C.D. was eligible for membership in the Cherokee Nation because of respondent's grandparents. Respondent conceded neither she nor her parents were members of any Native American tribe. According to respondent, she based her claim this case belonged in a tribal court on her ancestry, her molecular DNA, and other things she did not name. The State asked respondent which immediate grandparent she spoke to about his or her membership in the Cherokee Nation. Respondent answered she spoke to all of them before they passed away, called the State's line of questioning crazy, and told the State to prove her claim wrong. When respondent was asked what specific names she had seen "on the rolls" for the Cherokee Nation, she avoided answering the question and said she was not going to continue answering these questions. When asked if she had turned over to the Department of Children and Family Services (DCFS) any of the ancestry records she claimed to have in her possession, respondent answered, "I have not spoken to anybody from [DCFS] since they washed their hands, which they always do the first day, and then pass it off to people who have no idea what they're doing." Justin D. testified he was not a member of a Native American tribe.

¶ 10    The State argued C.D. could not be considered an "Indian child" under the definition provided by the Indian Child Welfare Act (ICWA) (25 U.S.C. §§ 1901 to 1963 (2018)) because neither of C.D.'s parents were members of a Native American tribe. Based on the representations respondent made under oath, the trial court granted respondent's motion to continue the case until July 14, 2022, over the objection of the State and C.D.'s guardian *ad litem.*

The court's written order indicates respondent testified she is not a member of a Native American tribe but is eligible for membership. The court noted DCFS had sent letters to the Federal Bureau of Indian Affairs and expected information by July.

¶ 11 On July 13, 2022, respondent's court-appointed counsel, Salena R. Young, filed a motion to withdraw, asserting the attorney-client relationship had deteriorated to a point where her representation of respondent was not possible. At a hearing on July 14, 2022, the trial court allowed attorney Young's motion with respondent's agreement. Respondent requested a new attorney, and the court appointed attorney Brendan Harris and continued the case for 21 days on respondent's motion without objection. The court scheduled the adjudicatory hearing for August 18, 2022. With regard to the applicability of ICWA, the State indicated a search for tribal membership had been done using the names of C.D.'s parents and none was found. The State noted that for a child to have tribal affiliation, one of the parents would have to have tribal affiliation. Then, respondent told the court the tribe her family was associated with is now "considered extinct" and claimed to be in the process of filing for recognition. However, the State asserted the ICWA only applies to federally recognized tribes.

¶ 12 The adjudicatory hearing began on August 18, 2022, with testimony from several officers from the Springfield Police Department. Officer Jeremy Roberts testified he responded to a disturbance call at respondent's home on March 9, 2021, indicating a white male was chasing a female with an axe or a hammer. Respondent, who had a small laceration to one of her fingers, was not cooperative. Justin D. claimed respondent hit him, causing the injuries to his face. Both respondent and Justin D. were arrested. Officer Roberts testified respondent and Justin D. had a history of domestic violence together.

¶ 13 Officers Rhet Spengel and Steven Baker testified they were each dispatched to

respondent's address on January 30, 2021, and February 19, 2021, respectively, in response to reported batteries. Respondent claimed Justin D., who was not present on either occasion, hit her with his fists. However, respondent had no observable injuries either day. Officer Spengel testified an infant and a 13-year-old child were present when he was there in January. Respondent said the infant was her child but refused to provide the child's name. Upon Officer Spengel's inquiry, respondent denied living with or having a romantic relationship with Justin D. However, respondent told Officer Baker that Justin D. had been her roommate for about five months and they had a history of violence. Officer Baker did not recall seeing any children with respondent in February.

¶ 14        Officer Tim Day testified he was dispatched to respondent's address for a reported battery on February 22, 2021. Initially, respondent talked about drugs being sold in the neighborhood and several other topics Officer Day characterized as "odd" and "out of place." When he asked why she called 911, respondent indicated Justin D., who again was not present, had punched her in the face approximately two hours earlier. Officer Day observed no injuries consistent with a battery. Respondent said Justin D. had been her roommate for about five months and reported five prior domestic violence incidents. Officer Day indicated respondent jumped from topic to topic and was difficult to understand. Additionally, Officer Day testified he had many contacts with respondent and had witnessed verbal altercations between respondent and Justin D. According to Officer Day, he was concerned respondent might have mental health issues based on statements she made. When he was present, he did not see any children at respondent's home.

¶ 15        Officer Monica Dorsey testified she was dispatched to a small apartment above a bar for a reported battery on October 11, 2021. Before entering the apartment, Officer Dorsey heard a verbal disturbance occurring in the apartment. Once she was inside, both respondent and

Justin D. said they were only having a verbal argument. However, respondent later claimed Justin D. grabbed her face. Officer Dorsey did not observe any injury. Both respondent and Justin D. claimed to live at the apartment, and both refused to leave. Respondent told Officer Dorsey she was pregnant, had been in a dating relationship with Justin D. for approximately two years, and had a history of domestic violence with Justin D. Neither party was arrested or forced to leave the residence. Later, during the same shift, Officer Dorsey was again dispatched to the apartment, where respondent indicated Justin D. had punched her in the face approximately six times. Officer Dorsey again saw no injuries to respondent's face and Justin D. denied any physical altercation occurred. Officer Dorsey testified no children were present.

¶ 16        Apple Glover, a DCFS child protection specialist, testified DCFS received a report regarding respondent's mental health on October 24, 2021, which was the day after C.D.'s birth. Glover went to the hospital and met with respondent. Respondent said she had completed a mental health evaluation at Memorial Behavioral Health Center. Glover indicated this was a self-reporting evaluation where the individual conducting the assessment asks questions and assesses the subject based on the answers given. As a result, the subject can simply state she does not have any issues. Glover indicated she was concerned with respondent's mental health because of the way she spoke. Respondent denied having any mental health issues but told Glover she had three other children who were not in her care. As for C.D.'s father, respondent acknowledged she and Justin D. had a history of domestic violence and had married in July 2021.

¶ 17        Because the investigation had just started and C.D. was a newborn, Glover had to make a safety determination for C.D. without the ability to verify certain information because it was a Sunday. On cross-examination, Glover indicated the hospital had initially discussed letting C.D. leave the hospital with respondent and Justin D. However, Glover directed the hospital not

to release the baby.

¶ 18    The adjudicatory hearing was continued until September 29, 2022, without any objection from the parties. Respondent requested an earlier date, but the trial court did not have dates available. On September 29, 2022, respondent and Justin D. moved to dismiss the petition pursuant to section 2-14 of the Act (705 ILCS 405/2-14 (West 2020)) because the adjudicatory hearing was not timely held. The court denied the motion, stating the State's only motion to continue was granted without objection and with good cause shown on March 22, 2022. The court attributed the other continuances to either agreement or the parents.

¶ 19    Joseph Dabrowski testified he worked on this case as a child protective investigator beginning on October 25, 2021. He determined respondent and Justin D. were C.D.'s parents and respondent had a prior DCFS investigation dating back to January 2021, which started because of domestic violence in the home. Respondent's mental health was also at issue. Respondent's other three children were removed from her care and placed with their fathers. Dabrowski noted he was the investigator on the prior case. In that case, respondent made irrational statements that individuals were breaking into her house, sharing a key to her house, the State was drugging her, and her daughter was a witch and making pornographic movies. Respondent also accused Justin D. of human trafficking, including trafficking respondent's daughter. In the prior case, Dabrowski had offered respondent an intact case, but she wanted nothing to do with DCFS and denied both a request for a toxicology screen and a mental health assessment from a licensed psychologist or psychiatrist. When the fathers of the three children took custody of the children, Dabrowski's involvement in the prior case ended. Respondent was not allowed unsupervised contact with her children while the case was active.

¶ 20    Turning to the October 2021 investigation at issue here, Dabrowski testified

DCFS's main concerns were respondent's mental health and the domestic violence that had occurred after January 2021. After meeting with respondent and Justin D. on October 25, 2021, at their home, Dabrowski determined respondent had not completed an acceptable mental health assessment. He told respondent she was going to be required to have a psychological evaluation. Because respondent had not corrected the issues from the prior case and refused to work with DCFS, Dabrowski did not institute a safety plan.

¶ 21　　　　Jamie Bramblett, a public service administrator at DCFS, testified she was Dabrowski's supervisor in October 2021 and was also involved in respondent's prior case. In January 2021, she determined a safety plan needed to be implemented because respondent presented as erratic and irrational. Bramblett was concerned about respondent's mental health because she made statements that small holes in her wall were being used by Justin D. and others to control her daughter's mind and engage her in child trafficking, Justin D. was part of a group called "Shade Balls" that was trafficking children, and she was working with the Federal Bureau of Investigation (FBI). Although respondent believed Justin D. was dangerous, she indicated a need to keep him close to her so she could have access to evidence of trafficking on his phone.

¶ 22　　　　According to Bramblett, in October 2021, C.D. was at risk of harm and DCFS needed to determine if respondent's mental health and domestic violence issues had been corrected. They determined these issues had not been resolved. Despite Justin D.'s alleged violence toward respondent, they continued in their relationship and the domestic violence issues continued as well between January and October 2021. Further, respondent had not obtained an appropriate mental health evaluation. Bramblett testified she decided to take protective custody of C.D.

¶ 23　　　　The adjudicatory hearing was continued again to October 20, 2022. Respondent

and Justin D. objected to the continuance. On September 30, 2022, respondent filed a *pro se* motion to dismiss the State's adjudicatory petition even though she was represented by attorney Harris at the time. Respondent's motion again challenged the timing of the adjudicatory hearing. Then, on October 3, 2022, respondent filed a *pro se* motion to vacate C.D.'s temporary custody order pursuant to section 2-10 of the Act (705 ILCS 405/2-10 (West 2020)) because C.D. was not brought before a judicial officer within 48 hours. According to respondent, C.D. was taken into protective custody on October 24, 2021, at 4:00 p.m., the matter was brought before a trial judge on October 26, 2021, and it was continued to October 28, 2021.

¶ 24 On October 20, 2022, at the continuation of the adjudicatory hearing, at respondent's request, attorney Harris indicated he had filed an agreed order to withdraw as respondent's counsel. Harris advised their communication had become so poor he did not believe he could effectively represent her interests. Respondent told the court she would prefer not to have anyone represent her. As a result, the court allowed attorney Harris's motion to withdraw and permitted respondent to represent herself. The court then addressed the *pro se* motions filed by respondent, which it denied. As to the motion to vacate C.D.'s temporary custody order, the court noted the minor did not have to be physically brought to court. Further, the court asserted the shelter care hearing was timely held. After a break in the proceeding, respondent failed to return to the courtroom when the adjudicatory hearing continued.

¶ 25 Justin D. testified C.D. was his only child. He denied ever being arrested for domestic violence or battery, denied physically harming respondent, but admitted they argued. He denied being told he could take C.D. home with him if he was not going to be with respondent. On cross-examination, Justin D. said he and respondent were living together when C.D. was born. After C.D.'s birth, he moved to his current address on Fourth Street in Springfield where

respondent was currently also residing.

¶ 26　　　　The trial court found the State proved by a preponderance of the evidence that C.D. was a neglected minor and his environment was injurious to his welfare. In the court's written adjudicatory order, it found C.D.'s environment was injurious to his welfare as evidenced by respondent's instability and domestic violence between her and Justin D. The order indicated C.D.'s parents were admonished they were required to cooperate with DCFS, comply with service plans, and correct conditions requiring C.D. to be in care. Otherwise, they risked termination of their parental rights.

¶ 27　　　　On November 16, 2022, the trial court entered a dispositional order, finding it was in C.D.'s best interest to be made a ward of the court, and placed him in the custody and guardianship of the guardianship administrator for DCFS.

¶ 28　　　　On December 8, 2022, respondent filed this appeal.

¶ 29　　　　　　　　　　　　　　II. ANALYSIS

¶ 30　　　　　　　　A. Illinois Supreme Court Rule 311(a) (eff. July 1, 2018)

¶ 31　　　　Pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), our decision was due to be filed on May 8, 2023. This court had good cause for not meeting this deadline. While continuances are disfavored and shall be granted only for compelling circumstances pursuant to Rule 311(a)(8), this case presented situations where this court found it necessary to grant respondent's multiple requests for extensions of time to file her appellant's brief for various reasons, including counsel's need to be out of state for a family matter, counsel's need to review arguments and authority respondent wanted included in her brief to avoid potential disciplinary action for the attorney, and the need to supplement the record with transcripts from the adjudicatory hearing and hearings where ICWA was discussed and possibly ruled on by the trial court.

¶ 32        Then, on March 31, 2023, respondent's appointed appellate counsel filed a motion to withdraw as respondent's attorney of record. Counsel indicated that on March 10, 2023, respondent attempted to file a motion to represent herself and a *pro se* appellant's brief. After doing so, respondent contacted counsel and expressed her strong desire to represent herself on appeal despite counsel's attempt to dissuade her. On April 10, 2023, this court allowed counsel's motion to withdraw. That same day, respondent, *pro se*, filed a 50-page appellant's brief. The State filed its brief on May 1, 2023. Respondent had until May 8, 2023, to file a reply brief but failed to do so. As a result, the case was not ready to be ruled on or assigned to this panel until after the May 8, 2023, deadline had passed. Regardless, pursuant to the spirit of Rule 311, we have decided the case as quickly as possible considering the numerous issues respondent raised in her lengthy *pro se* brief.

¶ 33        After respondent filed her appellate brief, she also filed numerous motions, which we have taken with the case. Two of these motions asked this court to expedite this appeal and advance the case on our docket. We deny these motions as moot because we have expedited this case pursuant to Rule 311.

¶ 34                    B. Motion to Strike the State's Brief

¶ 35        Before moving to the merits of respondent's appeal, we note respondent filed a motion, which we took with this case, asking this court to strike the State's brief because it summarized testimony from witnesses that was not part of the record. We deny this motion as the testimony in question can be found in supplements to the record that were allowed by this court.

¶ 36                    C. General Appellate Principals

¶ 37        Respondent chose to proceed *pro se* in this appeal. Illinois courts treat *pro se* litigants the same as licensed attorneys. A *pro se* litigant must comply with the same rules and is

- 11 -

held to the same standard as licensed attorneys. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78, 987 N.E.2d 1.

¶ 38       We first note issues not raised in the trial court are forfeited on appeal. *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 50, 168 N.E.3d 210. While the plain-error doctrine can be applied in abuse and neglect cases (*In re Andrea D.*, 342 Ill. App. 3d 233, 242, 794 N.E.2d 1043, 1050-51 (2003)), respondent makes no argument regarding its applicability here. Further, "[a] party cannot complain of error which he induced the court to make or to which he consented." *McMath v. Katholi*, 191 Ill. 2d 251, 255, 730 N.E.2d 1, 3 (2000). " 'It is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding.' " *McMath*, 191 Ill. 2d at 255, 730 N.E.2d at 3 (quoting *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543, 475 N.E.2d 817, 818 (1984)).

¶ 39       Further, even if an issue was raised in the trial court, Illinois Supreme Court Rule 341(h)(7) (eff. October 1, 2020) requires an appellant's brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." A reviewing court is not a depository for which the appellant, in this case respondent, may unload her burden of argument and research. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88, 36 N.E.3d 373. Pursuant to Rule 341(h)(7), "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."

¶ 40       It is also the appellant's burden to provide this court with a complete record to decide the issues raised on appeal. In *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984), our supreme court stated:

            "[A]n appellant has the burden to present a sufficiently complete record of the

> proceedings *** to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant."

We note the record on appeal does not contain transcripts of any hearings held prior to April 2022.

¶ 41 Respondent forfeited most of the issues she raises on appeal or is precluded from now arguing the trial court erred in several respects.

¶ 42                                      D. ICWA

¶ 43 Because respondent's argument regarding ICWA challenges the trial court's right to exercise its jurisdiction in this case, we address this issue first. Respondent provides no cogent legal analysis why the trial court erred by exercising its jurisdiction. As a result, we find respondent failed to comply with Rule 341(h)(7). However, considering ICWA is intended to serve the interests of Native American tribes, it is unclear whether a parent can forfeit the applicability of provisions under this federal law. *In re T.A.*, 378 Ill. App. 3d 1083, 1089, 883 N.E.2d 639, 644 (2008). As a result, regardless of respondent's failure to comply with Rule 341(h)(7), we will consider whether the trial court erred in exercising its jurisdiction. Essentially, the question of whether ICWA applies is one of statutory interpretation. Therefore, we will apply a *de novo* standard of review. *T.A.*, 378 Ill. App. 3d at 1087, 883 N.E.2d at 643.

¶ 44 "[ICWA] was adopted to respond to a crisis occurring in Indian tribes in which large numbers of Indian children were being separated from their families and placed in non-Indian homes." *In re Stiarwalt*, 190 Ill. App. 3d 547, 550, 546 N.E.2d 44, 47 (1989) (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)). This separation potentially deprived the children of their Indian heritage and threatened "the tribes' ability to function as an

autonomous community." *Stiarwalt*, 190 Ill. App. 3d at 551, 546 N.E.2d at 47 (citing *Holyfield*, 490 U.S. at 35-36).

¶ 45　　　　Section 1911(b) of ICWA (25 U.S.C. § 1911(b) (2018)) states:

"In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe." (Emphasis in original.)

Further, section 1912(a) of ICWA (25 U.S.C. § 1912(a) (2018)) states in part:

"In any involuntary proceeding in a State court, where the court *knows or has reason to know* that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (Emphasis added.)

It appears respondent believes C.D. should be considered an "Indian child." However, Congress specifically defined who is considered an "Indian child" under ICWA. Section 1903(4) of ICWA (25 U.S.C. § 1903(4) (2018)) states an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

¶ 46　　　　This court has held "[t]he party asserting the applicability of the Act has the burden

of producing sufficient evidence for the [trial] court to determine if the child is an [']Indian child.['] " *T.A.*, 378 Ill. App. 3d at 1090, 883 N.E.2d at 644. Respondent did not seem to understand it was her burden to present evidence C.D. qualified as an "Indian child." Instead, she took the approach it was the State's obligation to prove C.D. was not an "Indian child."

¶ 47        Based on the record on appeal, neither respondent nor anyone else provided the trial court with evidence which established the *court knew* C.D. was an "Indian child" as defined by ICWA. No one presented evidence C.D. was a member of a tribe. Further, both respondent and Justin D. each testified they were not members of a tribe.

¶ 48        Turning to whether the *trial court had reason to kno*w C.D. was an "Indian child," section 23.107(c) of Title 25 of the Code of Federal Regulations (25 C.F.R. § 23.107(c) (2021)) provides:

> "A court, upon conducting the inquiry required in paragraph (a) of this section, *has reason to know* that a child involved in an emergency or child-custody proceeding is an Indian child if:
>
>> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
>>
>> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
>>
>> (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;

(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;

(5) The court is informed that the child is or has been a ward of a Tribal court; or

(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe."

Once again, when section 23.107(c) (25 C.F.R. § 23.107(c) (2021)) refers to an "Indian child," it is referring to the term as defined by both ICWA and section 23.2 of Title 25 of the Code of Federal Regulations (25 C.F.R. § 23.2 (2021)). According to the Guidelines for Implementing ICWA found on the Bureau of Indian Affairs website:

"[Rule 23.107] reflects the statutory definition of 'Indian child,' which is based on the child's political ties to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship. ICWA does not apply simply based on a child or parent's Indian ancestry. Instead, there must be a political relationship to the Tribe.

Most Tribes require that individuals apply for citizenship and demonstrate how they meet that Tribe's membership criteria. Congress recognized that there may not have been an opportunity for an infant or minor child to become a citizen of a Tribe prior to the child-custody proceeding, and found that Congress had the power to act for those children's protection given the political tie to the Tribe through parental citizenship and the child's own eligibility." See U.S. Department

- 16 -

of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian

Child Welfare Act (Dec. 2016),

https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf.

None of these events occurred in this case. Instead, respondent simply tried to rely on her unsubstantiated claims of tribal ancestry. This court has held "the mere mention of Indian heritage does not give a trial court reason to know that the child is an Indian child." *T.A.*, 378 Ill. App. 3d at 1092, 883 N.E.2d at 646-47.

¶ 49       We note this is not a situation where the trial court ignored respondent's assertion C.D. had Native American ancestry. This matter was extensively discussed during proceedings before the court. At a hearing on April 21, 2022, respondent claimed C.D. was eligible for membership in the Cherokee Nation because "all" her grandparents are "listed on the rolls." However, she did not indicate she had personally seen their names "on the rolls." Instead, respondent explained she believed her grandparents were members of a Native American tribe based on ancestry, molecular DNA, and other things she did not name. In addition, it appears the State also looked into respondent's claims of Native American ancestry and found nothing requiring application of ICWA.

¶ 50       Even assuming, *arguendo*, respondent could have established one or more of her grandparents were members of a Native American tribe, that fact would not qualify C.D. as an "Indian child" as defined by ICWA. Based on the evidence contained in the record on appeal, respondent failed to establish C.D. meets the statutory definition of an "Indian Child" and as a result ICWA was inapplicable. Consequently, the trial court had jurisdiction to hear this case.

¶ 51       We note respondent filed two motions, which we took with this case, asking this court to vacate the trial court's orders and return custody of C.D. to respondent because of ICWA.

Because we have determined ICWA does not apply based on the available evidence in the record, we deny these motions for the reasons set forth herein.

¶ 52                              E. Timeliness of the Adjudicatory Hearing

¶ 53         We next turn to respondent's claim the State's petition should have been dismissed without prejudice because the adjudicatory hearing was not held within the time allowed by section 2-14(b) of the Act (705 ILCS 405/2-14(b) (West 2020)) and the trial court continued the case on more than one occasion in excess of 30 days. Section 2-14(b) of the Act (705 ILCS 405/2-14(b) (West 2020)) provides:

> "When a petition is filed alleging that the minor is abused, neglected or dependent, an adjudicatory hearing shall be commenced within 90 days of the date of service of process upon the minor, parents, any guardian and any legal custodian, unless an earlier date is required pursuant to Section 2-13.1. Once commenced, subsequent delay in the proceedings may be allowed by the court when necessary to ensure a fair hearing."

Respondent ignores that the statute also provides the time limits of section 14 may be waived with the consent of all parties and the court's approval (705 ILCS 405/2-14(d) (West 2020)).

¶ 54         In the trial court, respondent orally raised this issue in a motion to dismiss. However, she failed to do so until September 29, 2022, which was after the adjudicatory hearing was underway. In denying the motion to dismiss, the court indicated the only motion to continue filed by the State was on March 22, 2022. It was granted without objection and also for good cause shown. The court attributed all other continuances to either agreement of all the parties or to the parents. Respondent's brief does not address the court's reasoning for denying the motion to dismiss based on the time requirements found in section 2-14 of the Act (705 ILCS 405/2-14 (West

2020)).

¶ 55    We find respondent's argument forfeited for several reasons. First, she failed to make timely objections to the continuances and did not make a timely objection to the adjudicatory hearing itself. *Z.J.*, 2020 IL App (2d) 190824, ¶ 50. Second, pursuant to Rule 341(h)(7), she failed to provide this court with any cogent legal analysis explaining why the adjudicatory hearing was untimely considering she requested, agreed to, or did not object to the multiple continuances. Finally, even assuming, *arguendo*, respondent could establish the trial court erred in allowing so many continuances, respondent could not take advantage of the error pursuant to the invited error doctrine. *McMath*, 191 Ill. 2d at 255, 730 N.E.2d at 3. As a result, we decline to address this issue further.

¶ 56                              F. Adjudication of Neglect

¶ 57    We next turn to respondent's arguments regarding the trial court's October 20, 2022, adjudicatory order, where the court found C.D. was neglected because his environment was injurious to his welfare as evidenced by respondent's mental instability and her domestic violence issues with Justin D. Respondent argues C.D. had never been in an environment injurious to his welfare with respondent because they had never been together outside the hospital before C.D. was taken into protective custody. In addition, respondent asserts the State had no evidence C.D. had been neglected, respondent suffered from a mental illness, respondent had been injured by domestic violence, or that any child had witnessed the alleged domestic violence. Further, respondent claims the State had no evidence respondent had ever blatantly disregarded her parental responsibilities. At most, according to respondent, the State had evidence respondent had erratic thoughts and communication, which she contends are protected under the first amendment.

¶ 58    "There is no fixed meaning for the term 'neglect,' but it has been generally defined

as the failure to exercise the level of care that is required under the circumstances and it encompasses both the willful and the unintentional disregard of parental duty." *In re An.W.*, 2014 IL App (3d) 130526, ¶ 57, 17 N.E.3d 878. "[N]eglect may be found where a minor's environment is injurious to his or her welfare." *An.W.*, 2014 IL App (3d) 130526, ¶ 57. The term "injurious environment," like the term "neglect," does not have a fixed meaning. *An.W.*, 2014 IL App (3d) 130526, ¶ 57. "In general, the term 'injurious environment' has been defined as the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *An.W.*, 2014 IL App (3d) 130526, ¶ 57.

¶ 59        "When faced with evidence of prior neglect by a parent or parents, a trial court need not wait to take action until after each particular minor suffers an injury." *An.W.*, 2014 IL App (3d) 130526, ¶ 58. Our supreme court has explained:

> "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468, 819 N.E.2d 734 (2004).

Granted, "there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household." *Arthur H.*, 212 Ill. 2d at 468, 819 N.E.2d at 749. "Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipated neglect based upon the neglect of a child's sibling, must be reviewed according to its own facts." *Arthur H.*, 212 Ill. 2d at 468-69, 819 N.E.2d at 750.

¶ 60        Turning to respondent's evidentiary arguments, the State has the burden of proving allegations of neglect by a preponderance of the evidence at the adjudicatory hearing. *Arthur H.*,

212 Ill. 2d at 463-64, 819 N.E.2d at 747. We will only reverse a trial court's finding of neglect if it is against the manifest weight of the evidence. *A.P.*, 2012 IL 113875, ¶ 17. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *A.P.*, 2012 IL 113875, ¶ 17.

¶ 61      The State presented the testimony of several police officers who indicated they had responded to reports of domestic violence between respondent and Justin D. during the year prior to C.D.'s birth. Both respondent and Justin D. told responding police officers they had been struck by the other. The State also presented evidence some of the police officers found it difficult to comprehend what respondent was saying because she would jump from one topic to another while speaking.

¶ 62      Apple Glover, a DCFS child protection specialist, who spoke with respondent at the hospital after C.D.'s birth also testified respondent indicated she and Justin D. had a history of domestic violence. Glover also indicated she was concerned about respondent's mental health because respondent jumped from topic to topic during their conversation.

¶ 63      Joseph Dabrowski, a DCFS investigator, testified he began working on this case on October 25, 2021, and learned another DCFS investigation was already under way involving respondent and her other children because of domestic violence issues in the home and respondent's mental health. During the prior January 2021 DCFS investigation, respondent made odd statements that the State was drugging her, one of her daughters was a witch and making pornographic movies, and Justin D. was involved in human trafficking and was trafficking respondent's daughter. Respondent also indicated she wanted nothing to do with DCFS and refused to submit to a toxicology screen and a mental health assessment from a licensed psychologist or psychiatrist. When investigating this case, Dabrowski determined respondent had

not undergone an acceptable mental health assessment and told respondent she was going to be required to complete a psychological evaluation.

¶ 64 Jaime Bramblett, a public service administrator at DCFS who was also involved in both the prior investigation and this case, indicated respondent appeared erratic, irrational, and unable to maintain a clear train of thought when Bramblett had contact with her during the January 2021 case. During the January 2021 investigation, respondent claimed Justin D. and others were using small holes in her walls to control her daughter's mind and also traffic her. Respondent also stated the "mark of the beast" had formed and later fell off her neck. Moreover, respondent was concerned about "the end of days." In addition, although respondent believed Justin D. was a danger to her because of domestic violence issues, respondent indicated she needed to keep him close to gather evidence of his child trafficking. According to respondent, she was working with the FBI. However, she stated the FBI refused to accept information she tried to provide them. Bramblett testified respondent's statements during the January investigation made Bramblett concerned for respondent's mental health. Further, it appeared respondent's mental issues had escalated to a point where her three children at the time were in danger. According to Bramblett, respondent made statements she punished her daughter for being a witch, a statement a rational person would have known was not the case.

¶ 65 During the October 2021 investigation, Bramblett indicated DCFS was investigating whether C.D. was subject to a risk of harm, considering the removal of the other children nine months earlier and respondent's inability to be around those children without supervision. DCFS was concerned about respondent's mental health and the ongoing domestic violence issues between respondent and Justin D. Bramblett testified C.D. was not safe in the care of either respondent or Justin D. because they were still in a relationship despite the domestic

violence respondent alleged. According to Bramblett's testimony, the police had continued to respond to domestic violence calls from respondent during the period from January 2021 until C.D.'s birth. Further, Bramblett testified respondent had not obtained an appropriate mental health evaluation.

¶ 66 When Bramblett was asked why she was concerned about respondent parenting C.D., Bramblett responded children in respondent's care could be in danger because respondent had used corporal punishment on one of her children in the past for alleged behavior a rational person would know was not true. Specifically, Bramblett said respondent's nine-year-old daughter reported that respondent had subjected her to corporal punishment because respondent believed the young girl was engaging in child pornography and trafficking. Bramblett testified, "Unfortunately, mental health is not something we can predict, so if a parent has already established that their beliefs will result in a child being punished, including corporal punishment, that's a very serious concern."

¶ 67 The evidence in this case was sufficient to establish by a preponderance of the evidence that C.D.'s environment with respondent and Justin D. would be injurious to his welfare based on respondent's mental instability and the domestic violence issues between respondent and Justin D. Based on this evidence, it is not clearly evident the trial court erred in finding C.D.'s environment was injurious to his welfare.

¶ 68                                     G. Other Issues

¶ 69 Respondent raised a host of other procedural issues in her *pro se* brief. However, many of these issues are forfeited, others are moot, and some are meritless. For example, respondent contends the investigation was arbitrary and the State engaged in malicious prosecution. She also argues the case was subject to involuntary dismissal because the facts had

already been adjudicated in a prior hearing. Considering the evidence described above and the fact C.D. was not born during the prior adjudication referred to by respondent, these are meritless claims we need not address further.

¶ 70　　　　Turning to respondent's argument the seizure of C.D. violated the Illinois Reproductive Health Act (775 ILCS 55/1-20 (West 2020)) and section 3.4(a)(15) of the Medical Patient Rights Act, we find respondent forfeited this argument pursuant to Rule 341(h)(7) because she provided no cogent legal analysis explaining how DCFS's actions violated either of these statutes based on the facts in this case.

¶ 71　　　　Respondent also claims she was denied her constitutional right to a jury trial. However, as the First District explained in *In re K.J.*, 381 Ill. App. 3d 349, 351-53, 885 N.E.2d 1116, 1118-1120 (2008), respondent did not have a right to a jury trial in this type of case. Thus, this issue is meritless.

¶ 72　　　　Moving on, respondent argued the trial judge had a duty to recuse himself. First, respondent provides no indication she filed a motion seeking a substitution of judge as a matter of right or a petition seeking the judge's recusal for cause. As a result, this issue is forfeited on that basis. *Z.J.*, 2020 IL App (2d) 190824, ¶ 50. In addition, respondent forfeited this issue pursuant to Rule 341(h)(7) because she failed to provide this court with any legal analysis why her allegations regarding the trial judge necessitated his removal. Regardless, we find no reason in the record to support why the trial judge would have been removed for cause or had a duty to recuse himself.

¶ 73　　　　Additionally, respondent argues the State's petition was not properly drafted. This argument is forfeited because she did not raise it in the trial court. *Z.J.*, 2020 IL App (2d) 190824, ¶ 50.

¶ 74　　　　Next, respondent contends her due process rights were violated at the shelter care

hearing. She asserts she was not provided notice of the shelter care hearing or counsel at the hearing. Further, she claims C.D.'s right to counsel was violated. The trial court's written order on October 26, 2021, contradicts these claims. The order indicates respondent did receive notice, was present, counsel was appointed to represent her, and a guardian *ad litem* was present on behalf of C.D. Respondent also claims the shelter care hearing was not timely held. However, the court's order indicates the shelter care hearing was continued from October 26, 2021, until October 28, 2021, at the request of respondent and Justin D. so they could consult with their respective appointed attorneys. As a result, we need not look at this issue further because the alleged error was invited by respondent. See *McMath*, 191 Ill. 2d 251 at 255, 730 N.E.2d at 3 ("A party cannot complain of error which he induced the court to make or to which he consented.").

¶ 75        Further, respondent takes issue with the fact C.D. was not physically brought to the shelter care hearing and argues C.D. should be immediately released. The written order from the October 26, 2021, hearing indicates a guardian *ad litem* was present but C.D. was not. We do not have a transcript from the hearing to see if an explanation was given for C.D.'s absence and do not know whether respondent objected to or agreed to it. Regardless, based on this court's decision in *In re J.W.*, 386 Ill. App. 3d 847, 852, 898 N.E.2d 803, 808 (2008), this issue is moot because we have ruled the trial court did not error in adjudicating C.D. a neglected minor and respondent did not challenge the court's dispositional finding. Respondent filed a motion that we took with the case also seeking C.D.'s immediate release because C.D. did not appear personally at the shelter care hearing. For the reasons stated above, we also deny this motion as moot.

¶ 76        Turning to the portion of respondent's briefs with the heading, "W[h]ether the Integrated Assessment and Other Hearsay Evidence was Admissible," it is not clear what respondent is requesting from this court. As for the portion of her brief alleging breach of contract

and child abduction, it appears she is discussing things that did not occur in this particular case. Finally, she makes claims throughout her brief regarding federal funding and alleges this case constitutes a false claim as a matter of law. While not entirely clear, it does not appear these claims have any relevance to our review of the trial court's findings at issue in this appeal. As a result, we conclude, based upon the record before us, that said claims are without merit and decline to address these issues further.

¶ 77                                    H. Additional Motions

¶ 78            Finally, we address respondent's four remaining motions that were taken with the case. In the first of these motions, respondent asks this court to strike confidential health information from the record. We deny the motion because it is unclear the information is even contained in the record because she failed to provide a record citation. Respondent's next two motions ask this court to order DCFS to return C.D. to her custody and to strike evidence in the record from Sangamon County case Nos. 21-OP-169, 21-OP-163, and 19-F-513. We deny both of these motions pursuant to Rule 341(h)(7) because issues regarding the trial court's dispositional ruling and evidentiary rulings should have been raised and argued in respondent's appellant's brief instead of in motions filed after respondent filed her appellant's brief. Although Rule 341(h)(7) does not specifically state forfeited points shall not be raised in motions filed by an appellant after she has filed her appellant's brief, a contrary ruling would create an unacceptable exception to the forfeiture provision in Rule 341(h)(7). Finally, respondent filed a motion to compel DCFS to produce the case file for her case that began in January 2021. We deny this motion because it is unclear respondent raised this issue in the trial court. Assuming, *arguendo*, she did raise the issue and the trial court denied her request, the issue should have been argued in her appellant's brief, not in a motion.

¶ 79                              III. CONCLUSION

¶ 80        For the reasons stated, we affirm the trial court's judgment.

¶ 81        Affirmed.